IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 08-08321 (BKT) |
| | CHAPTER 11 |
| EL LEGADO DE CHI CHI RODRÍGUEZ GOLF RESORT SC, S.E. | |
| Debtor | |

## DISCLOSURE STATEMENT

GERENA LAW OFFICE
Attorney for Debtor
PO BOX 195542
San Juan, P.R. 00919-5548
Tel: (787)766-0780
Fax: (787)766-0780
jlgere@gmail.com

By: s/Jorge L. Gerena Mendez
Jorge L. Gerena Mendez
USDC PR No. 211701

McCONNELL VALDES LLC
Attorneys for Juan A. Rodríguez Vilá
270 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Telephone: (787) 250-5604/5681
Fax: (787) 759-2771/2783
aaa@mcvpr.com
ycp@mcvpr.com

By: s/Antonio A. Arias-Larcada
Antonio A. Arias-Larcada
USDC PR No. 204906

By: s/ Yarilyn C. Pérez-Colón
Yarilyn C. Pérez-Colón
USDC PR No. 224514

Dated: May 10, 2010

## INDEX

I.     INTRODUCTION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

II.    SUMMARY OF THE PLAN   . . . . . . . . . . . . . . . . . . . . . . . .   7

III.   INFORMATION ABOUT THE REORGANIZATION PROCESS . . . . . . . . . .   11

    3.1   Purpose of a Disclosure Statement . . . . . . . . . . . . . . . . . . . .   11
    3.2   Voting Procedure   . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
    3.3   Ballots   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
    3.4   The Confirmation Hearing . . . . . . . . . . . . . . . . . . . . . . .   13
    3.5   Acceptances Necessary to Confirm the Plan   . . . . . . . . . . . . . .   14
    3.6   Confirmation of the Plan Without the Necessary Acceptances . . . . . . .   14

IV.    GENERAL INFORMATION OF THE DEBTOR   . . . . . . . . . . . . . . . . .   15

    4.1   Description of the Debtor   . . . . . . . . . . . . . . . . . . . . . . .   15
    4.2   Events Preceding Debtor's Chapter 11 Filing . . . . . . . . . . . . . . .   17
    4.3   Debtor's Post-Petition Endeavors . . . . . . . . . . . . . . . . . . . .   20
    4.4   Employment of Professionals. . . . . . . . . . . . . . . . . . . . . . . . . .   22

V.     DEBTOR'S FINANCIAL INFORMATION. . . . . . . . . . . . . . . . . . . . . . .   23
    5.1   Partner and Principal Operating Officers. . . . . . . . . . . . . . . . . . . .   23
    5.2   Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23
    5.3   Liabilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24
    5.4   Pending Litigation and other Liabilities. . . . . . . . . . . . . . . . . . . . .   25
    5.5   Leases and contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

VI.    THE REORGANIZATION PLAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

    6.1   Overview of the Chapter 11. . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
    6.2   Overall Structure of the Plan. . . . . . . . . . . . . . . . . . . . . . . . . . .   30
    6.3   Classification and Treatment of Claims and Interests. . . . . . . . . . . . .   30
    6.4   Classes of Claims and Equity Interest. . . . . . . . . . . . . . . . . . . . .   33
    6.5   Treatment of Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
    6.6   Method of Distributions Under the Plan. . . . . . . . . . . . . . . . . . . . .   39
    6.7   Allowance and Payment of Certain Administrative Claims. . . . . . . . . . .   43
    6.8   Reservation of Right to Object to Allowance or Priority of Claims. . . . . . .   45
    6.9   Special Provision Regarding Unimpaired Claims. . . . . . . . . . . . . . . .   46
    6.10  Procedures for Resolving Disputed, Contingent, and Unliquidated. . . . . . .   46

VII.   THE REORGANIZED DEBTOR . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

    7.1   Strategic Initiatives that lead to Reorganization. . . . . . . . . . . . . . . . .   46
    7.2   The Business Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

VIII.   EL LEGADO FINANCIAL DISCUSSION………....................……….…….…....58

        8.1   Capital Structure………….…...................…......................……58
        8.2   Summary of Sources…………......................…....................59
        8.3   Summary of Uses…………….....................…......................59

IX.   FINANCIAL PROJECTIONS………….....................……………....62

        9.1   Senior Project Loan…………….…...................…...................62
        9.2   Restructuring and Subordination of Existing Loan………….................. 63
        9.3   Cash Flow and Debt Repayment Financial Projection Highlights………...64

X.   DETERMINATION OF CLAIMS……………......…....................................67

XI.   LIQUIDATION ANALYSIS / BEST INTERESTS TEST…………..........…......67

XII.   FEASABILITY OF THE PLAN…………......…....................................70

XIII.   ALTERNATIVES TO THE PLAN…………......….....................…….......71

XIV.   EFFECT OF CONFIRMATION……………......…......................…....71

XV.   RECOMMENDATION…………….....…....................….....................72

## I.    <u>INTRODUCTION</u>:

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §101, et seq. (the "Bankruptcy Code"), El Legado de Chi Chi Rodríguez Golf Resort (S.C.) S.E., debtor ("Debtor"), and Mr. Juan A. Rodríguez Vilá, creditor and majority partner of debtor herein ("Mr. Rodríguez") (hereinafter collectively  the "Proponents"), submit this disclosure statement (the "Disclosure Statement") to all of the Debtor's known Creditors and Interest holders in connection with their Joint Plan of Reorganization (the "Plan"), dated as of the date of this Disclosure Statement.   The Plan has been developed based upon thorough review and analysis of Debtor's financial condition, business plan, and rehabilitation alternatives. Debtor and Mr. Rodríguez believe that the Plan provides fair and equitable treatment of all classes of Creditors and Interest Holders and the greatest feasible recovery to Creditors and Interest Holders. Accordingly, the Proponents request that all Creditors and Interest Holders in Impaired Classes vote to accept the Plan.  The Plan, a copy of which accompanies this Disclosure Statement as **Exhibit A**, is being filed with the Bankruptcy Court simultaneously herewith.

Specifically, the purpose of this Disclosure Statement is to give Creditors and Interest Holders sufficient information, as far as it is reasonably practicable for the Debtor and Mr. Rodríguez to provide, that would allow a hypothetical reasonable investor typical of the holders of Claims and Interests in the classes Impaired under the Plan to make an informed judgment about whether to accept or reject the Plan.  The description of the Plan in this Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.  Capitalized terms not otherwise defined herein

have the same meaning as set forth in the Plan; other terms shall have the meaning

ascribed to them in the Bankruptcy Code. In the event of any inconsistencies between this

Disclosure Statement and the Plan, the terms of the Plan shall control. Please refer to the

Plan for the treatment of Claims and Interests. The provisions of the Plan are binding on all

Creditors and Interest Holders, therefore, please read the Plan carefully.

NO REPRESENTATIONS ABOUT THE DEBTOR, PARTICULARLY ABOUT THE

DEBTOR'S FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS PROPERTY,

ARE AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS

DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO

SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS

CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY

ANY CREDITOR OR INTEREST HOLDER. ANY ADDITIONAL REPRESENTATION OR

INDUCEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR OR TO

THE UNITED STATES TRUSTEE WHO, IN TURN, SHALL DELIVER THE

INFORMATION TO THE BANKRUPTCY COURT OR TAKE OTHER APPROPRIATE

ACTION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS

NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  FOR THE FOREGOING REASON, AS

WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS,

ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ABSOLUTE ACCURACY,

DEBTOR AND MR. RODRÍGUEZ ARE UNABLE TO WARRANT OR REPRESENT THAT

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS COMPLETE

AND ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO

PRESENT COMPLETE AND ACCURATE INFORMATION. THE RECORDS KEPT BY THE DEBTOR RELY FOR THEIR ACCURACY ON INTERNAL BOOKKEEPING. THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE FREE OF ANY INACCURACY. HOWEVER, EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT ACCURATE INFORMATION. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY DEBTOR AND MR. RODRíGUEZ BASED UPON THEIR KNOWLEDGE OF DEBTOR'S RECORDS, BUSINESS AND AFFAIRS.

ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW IN FULL THE PLAN AND THIS DISCLOSURE STATEMENT TOGETHER WITH ALL EXHIBITS ATTACHED THERETO, PRIOR TO VOTING ON THE PLAN, AND MAY DESIRE TO CONSULT LEGAL COUNSEL PRIOR TO VOTING TO ENSURE COMPLETE UNDERSTANDING OF THEIR TREATMENT UNDER THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS AND INTEREST HOLDERS OF THE DEBTOR TO ENABLE THEM TO MAKE AN INFORMED DECISION ABOUT THE PLAN.

EACH CREDITOR AND INTEREST HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO IT UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS.

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AS PROVIDING INFORMATION DEEMED ADEQUATE TO

PERMIT DEBTOR'S CREDITORS TO MAKE AN INFORMED JUDGMENT IN EXERCISING THEIR RIGHT TO VOTE FOR OR AGAINST THE PLAN.

PROPONENTS BELIEVE THAT THIS DISCLOSURE STATEMENT (INCLUDING EXHIBITS) CONTAINS "ADEQUATE INFORMATION," AS THAT TERM IS DEFINED IN SECTION 1125(A)(1) OF THE BANKRUPTCY CODE. THE "ADEQUATE INFORMATION" HEREIN PROVIDED CONSISTS OF INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTOR, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF THE HOLDERS OF CLAIMS AND INTERESTS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND WHETHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT SETS FORTH CERTAIN INFORMATION REGARDING THE DEBTOR'S PREPETITION OPERATING AND FINANCIAL HISTORY, THE NEED TO SEEK CHAPTER 11 PROTECTION, AND THE ANTICIPATED REORGANIZATION OF THE DEBTOR UPON SUCCESSFUL EMERGENCE FROM CHAPTER 11. THIS DISCLOSURE STATEMENT ALSO DESCRIBES THE CONFIRMATION PROCESS, THE MANNER IN WHICH DISTRIBUTIONS WILL BE MADE UNDER THE PLAN AND THE VOTING PROCEDURES THAT HOLDERS OF CLAIMS ENTITLED TO VOTE UNDER THE PLAN MUST FOLLOW FOR THEIR VOTES TO BE COUNTED.

<u>SPECIAL NOTE REGARDING FORWARD LOOKING STATEMENTS</u>

This Disclosure Statement contains forward-looking statements, including statements concerning possible or assumed future results of operations of the Debtor

*El Legado Golf Resort (S.C.) S.E.*
Disclosure Statement

and those preceded by, followed by, or that include the word may, will, should, could, expects, plans, anticipates, believes, estimates, predicts, potential, or continue or the negative of such terms and other comparable terminology. You should understand that the factors described below, in addition to those discussed elsewhere in this Disclosure Statement could materially affect the Debtor's future results and could cause those results to differ materially from those expressed in such forward looking statements. These factors include but are not limited to:

- market conditions that adversely affect demand for certain products and services, and that delay attaining profitability and positive cash flow;
- fluctuating foreign currencies could adversely affect Debtor's revenue, operations and cash flow;
- the potential for additional adverse commercial and credit market developments;
- issues related to Debtor's financial situation and liquidity needs increasing the risk that it is unable to invest adequately in the business and may fail to attract and retain sufficient customers;
- potential difficulties in attracting and retaining quality management and key personnel to execute Debtor's current business strategy;
- competition against large, financially stronger competitors; and
- a regulatory environment that is subject to constant change.

Any financial forecasts or other forward-looking analyses contained herein were not prepared with a view to comply with the guidelines for prospective financial statements Published by the American Institute of Certified Public Accountants.

Debtor and Mr. Rodríguez believe that the Plan provides, under the circumstances, the best possible recoveries to creditors and that acceptance of the Plan

is in the best interests of all parties in interest. Accordingly, Debtor and Mr. Rodríguez urge all creditors entitled to vote to cast their Ballots in favor of the Plan.

## II.   <u>SUMMARY OF THE PLAN</u>

The Plan specifies the manner in which the Claims and Interest are to be treated. Allowed Administrative Expense Claims and Allowed Priority Tax Claims are not classified for purposes of voting under the Plan, but the Plan does provide for the treatment of such Claims. The table below provides a summary of the treatment of those claims and of the various Classes of Claims against Debtor. To the extent that the terms of this Disclosure Statement vary from those of the Plan, the terms of the Plan will control.

| DESCRIPTION OF CLAIM | CLASS | ESTIMATED AMOUNT ALLOWED UNDER THE PLAN | TREATMENT UNDER THE PLAN/ ESTIMATED RECOVERY UNDER THE PLAN |
|---|---|---|---|
| Post-petition Financing Super priority Claim | Class 1 | $ 9,614,804 | Unimpaired.<br>Estimated Recovery:    100%<br><br>This class shall consist of allowed post-petition credit on moneys lent by a Financial Institution.<br><br>Upon certain post-petition Credit Agreement and, after notice and hearing, approval of the Bankruptcy Court, a Financial Institution will provide working capital of $ 9,614,804 for the completion of residential villas, refurbish of the Golf Course, and partially fund reserves for the operation of the Reorganized Debtor. The New Credit Facility will be originated as a non-revolving line of credit for construction purposes which will convert into a five year term loan upon completion of construction. This loan shall be for the payment of the aforesaid items and shall accrue interest at the rate provided for in the Senior Loan Term Sheet.<br><br>To assure the payment of the Class 1 claim, on the Effective Date, Debtor will issue such notes, mortgages, assignments, and other security document as may be required by the lender as a Senior Lien on all assets of the Debtor.<br><br><u>See</u> sections 364 and 507 of the Bankruptcy Code. |

*El Legado Golf Resort (S.C.) S.E.*
Disclosure Statement

Case No. 08-08231(BKT)
Page 8 of 72

| DESCRIPTION OF CLAIM | CLASS | ESTIMATED AMOUNT ALLOWED UNDER THE PLAN | TREATMENT UNDER THE PLAN/ ESTIMATED RECOVERY UNDER THE PLAN |
|---|---|---|---|
| Holders of Allowed Administrative Expense Claims | N/A | $ 69,582.00 | Unimpaired . <br><br> Estimated Recovery:   100% <br><br> Subject to the provisions set forth on the Plan, each holder of an allowed Administrative Expense Claim, shall receive in full satisfaction thereof an amount in Cash equal to the Allowed amount of such claim on the later of, (i) the date such claim becomes Allowed or, (ii) the Effective Date. <br><br> Proponents estimate the liability in this Class not to exceed the amount of $70,000. <br><br> See sections 330(a), 331, 503 and 507(a) of the Bankrutpcy Code. |
| Holders of Allowed Priority Tax Claims | N/A | $ 682,526.68 | Unimpaired <br><br> Estimated Recovery:   100%} <br><br> At Debtor's election, holder of an Allowed Priority Tax Claim shall receive in full satisfaction thereof an amount in Cash equal to the Allowed amount of such claim on, (i) the dated such claim becomes Allowed or, (ii) the Effective Date of the Plan. <br><br> See sections 503(b) of the Bankruptcy Code. |

*El Legado Golf Resort (S.C.) S.E.*
Disclosure Statement

**Case No. 08-08231(BKT)**
Page 9 of 72

| DESCRIPTION OF CLAIM | CLASS | ESTIMATED AMOUNT ALLOWED UNDER THE PLAN | TREATMENT UNDER THE PLAN/ ESTIMATED RECOVERY UNDER THE PLAN |
|---|---|---|---|
| Westernbank's Secured Claims | Class 2 | $ 10,000,000 | Impaired<br><br>Estimated Recovery of Secured Claims: 37.37 %<br><br>Estimated Recovery of Unsecured Claims: Unknown<br><br>At Debtor's election, Westernbank's Secured Claims, shall be paid either (i) upon such terms as may be agreed to with such holder or (ii) in full through regular installment payments in cash of a total value, as of Effective Date of the Plan, equal to the allowed amount of such claims over a period ending not later than ten (10) years after the closing date, including interest of 8% per annum. This claim shall be subordinated in right of payment to the Senior Lien as described in the Plan.<br><br>The remaining of Westernbank claims for $16,761,353.64 is dealt as a Class 3 General Unsecured Claim.<br><br>In the event Class 2 votes to reject the Plan, the above distribution shall be forfeited. |
| Holders of Allowed General Unsecured Claims (including deficiency of Westernbank's secured claims) | Class 3 | $ 250,000.00 | Impaired.<br><br>Estimated Recovery: 1.30%<br><br>This class consists of all allowed, undisputed, noncontingent unsecured claims listed in the Debtor's petition or as otherwise approved by the Court and the deficiency of Westernbank's secured claims.<br><br>Unless the Holder of such Claim and the applicable Debtor agree to a different treatment, at Debtor's election, each Holder of an Allowed General Unsecured Claim will receive on its Claim its Pro Rata Share of the Allowed Claim ($250,000.00) at year seven (7) after the closing date.<br><br>In the event Class 3 votes to reject the Plan, the above distribution shall be forfeited.<br><br>See sections 1129(b) of the Bankruptcy Code. |

*El Legado Golf Resort (S.C.) S.E.*
Disclosure Statement

Case No. 08-08231(BKT)
Page 10 of 72

| DESCRIPTION OF CLAIM | CLASS | ESTIMATED AMOUNT ALLOWED UNDER THE PLAN | TREATMENT UNDER THE PLAN/ ESTIMATED RECOVERY UNDER THE PLAN |
|---|---|---|---|
| Holders of General Unsecured Contingent & Disputed Claims | Class 4 | $ 7,707,007.36 | Impaired<br><br>Estimated Recovery: 0%<br><br>Unless the Holder of such Claim and the applicable Debtor agree to a different treatment, on the Effective Date, Holders of a General Unsecured Contingent and Disputed Claim will be discharged and cancelled and the Holders of a General Unsecured Contingent and Disputed Claim shall not receive or retain any distribution on account of such other interests<br><br>See sections 1129(b) of the Bankruptcy Code. |
| Equity Interest in Debtor | Class 5 | $ 6,986,911.00 | Impaired<br><br>Estimated Recovery: 0%<br><br>Holder of Equity Interest in Debtor will receive no distribution and retain no rights or property on account of their Equity Interest which shall be deemed extinguished on the Effective Date. The shares of these holders will be canceled on the Effective Date.<br><br>Holders of Equity Interest in Debtor will not be entitled to vote to accept or reject the Plan due to their treatment indicated below and the provisions of Section 1126(g) of the Bankruptcy Code. |

For a more detailed description of the treatment of the foregoing classes of Claims and Interest, see "Treatment of Claims and Interest Under the Plan". This Disclosure Statement has been prepared to provide creditors with adequate information so that they can make an informed judgment about the Plan. Each creditor should read this Disclosure Statement and the Plan in their entirety before voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement and no person has been authorized to utilize any information concerning Debtor's assets other than the information contained herein for purposes of solicitation.

## III.     INFORMATION ABOUT THE REORGANIZATION PROCESS

## 3.1   Purpose of a Disclosure Statement

The Disclosure Statement includes background information about the Debtor and identifies the classes into which creditors have been placed by the Plan. The Disclosure Statement describes the proposed treatment of each of those classes if the Plan is confirmed. In addition, it contains information concerning the prospects in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

Upon its approval by the Bankruptcy Court, the Disclosure Statement and the Exhibits thereto will have been found to contain, in accordance with the provisions of the Bankruptcy Code, adequate information of a kind and in sufficient detail to enable a reasonable, hypothetical investor, typical of a holder of an impaired claim or an interest to make an informed judgment about the Plan. Approval of the Disclosure Statement, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

## 3.2   Voting Procedure

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing and causing the Ballot Forms accompanying this Disclosure Statement as Exhibits **B-1, B-2, B-3, B-4,** and **B-5,** to be returned to the following address:

> Mr. Juan A. Rodríguez Vilá
> c/o Antonio Arias Larcada,
> McCONNELL VALDES LLC
> 270 Muñoz Rivera Avenue
> Hato Rey, Puerto Rico 00918

The Ballots must be received on or before 4:00 P.M. (Eastern Standard Time) at a date to be determined by the court, to be counted in the voting. Ballots received after this time will not be counted in the voting unless the Bankruptcy Court so orders.

Proponents recommend a vote for "ACCEPTANCE" of the Plan.

## 3.3.  Ballots

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or equity interests which are "impaired" under the terms and provisions of a plan are entitled to vote to accept or reject such plan.

Members of Class 1, Allowed Priority Tax Claims Class, and Allowed Administrative Expenses Claims, are unimpaired under the Plan, are deemed to have accepted the Plan and are not entitled to vote. Members of Classes 2, 3 and 4 are impaired under the Plan and entitled to vote. Members of impaired Classes will be asked to vote for acceptance or rejection of the Plan. A party who holds claims in more than one impaired Class should complete a Ballot for each Class with respect to the applicable portion of the claim included in each Class.

The Holders of Interests in Debtor, Class 5 are impaired under the Plan, and are deemed to have rejected the Plan and are not entitled to vote since the interests of such Class do not entitle the holders of such interests to receive or retain any property under the Plan. Class 2 Westernbank, Class 3 of General Unsecured Claims, and Class 4 General Unsecured Contingent & Disputed Claims Holders will be asked to vote for acceptance or rejection of the Plan.

## 3.4  The Confirmation Hearing

Pursuant to Sections 1125 and 1128 of the Bankruptcy Code, the Bankruptcy Court will schedule a hearing on confirmation of the Plan to commence as soon as the parties can be heard. The Confirmation Hearing will be held before the Honorable Brian K. Tester, United States Bankruptcy Judge, San Juan, Puerto Rico. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and in the best interests of holders of claims and interest. The Bankruptcy Court will also receive and consider a Report of Plan Voting prepared by Proponents, summarizing the votes for acceptance or rejection of the Plan by parties entitled to vote.

The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

At the Confirmation Hearing, with respect to the Plan, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained for each Class, (ii) hear and determine objections, if any, to the Plan and to the confirmation of the Plan, that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be in writing, filed and served as required by the Bankruptcy Court pursuant to the order approving the Disclosure Statement on the U.S. Trustee and all parties appeared and requested to be served with pleadings filed in the case.

## 3.5    Acceptances Necessary to Confirm the Plan

*El Legado Golf Resort (S.C.) S.E.*
Disclosure Statement

Case No. 08-08231(BKT)
Page 14 of 72

The vote of each holder of an impaired claim is important, since at the Confirmation Hearing and as condition to the confirmation of the Plan on a consensual basis, the Bankruptcy Court must determine, among other things, whether each impaired Class has accepted the Plan. Under Section 1126 of the Bankruptcy Code, an impaired Class is deemed to have accepted the Plan if at least ⅔ in amount and more than ½ in number of the Allowed Claims of the Class members who actually cast ballots to accept or reject the Plan, accept the Plan. Further, unless there is acceptance of the Plan by all members of an impaired Class, the Bankruptcy Court must also determine that under the Plan, Class members will receive property of a value, as of the Effective Date, that is not less than the amount that such Class members would receive or retain if Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

## 3.6   Confirmation of the Plan without the Necessary Acceptances

If a Class or Classes of impaired Claims do not accept the Plan, Proponents will request confirmation of the Plan under the "cram down" provisions of Section 1129(b) of the Bankruptcy Code, which permit confirmation, notwithstanding non-acceptance by one or more impaired classes, if the Bankruptcy Court finds that the Plan does not discriminate unfairly against and is fair and equitable as to each non-accepting Class, as long as at least one class of impaired creditors votes to accept the Plan. Section 1129(b) of the Bankruptcy Code requires among other things, that claimants must either receive the full value of their claims and if they receive less, that no Class with junior liquidation priority may receive anything.

THESE CALCULATIONS ARE BASED ONLY ON THE SCHEDULES CLAIM AMOUNTS, PRESENT VALUE OF DEBTOR'S PROPERTY AND NUMBER OF CREDITORS WHO ACTUALLY VOTE.  ANY BALLOT THAT IS VALIDLY EXECUTED THAT DOES NOT CLEARLY INDICATE REJECTION OF THE PLAN, SHALL BE DEEMED TO CONSTITUTE A VOTE FOR ACCEPTANCE OF THE PLAN. THE VOTE OF EACH CREDITOR IS IMPORTANT.

## IV.   GENERAL INFORMATION OF THE DEBTOR

### 4.1   Description of the Debtor

Debtor is a for-profit limited partnership organized under the laws of the Commonwealth of Puerto Rico on May 14, 2004 and registered under File Number 143,825 at the Department of State of Puerto Rico, whose partners are Mr. Rodríguez, TMG, Inc. ("TMG"), and Potrero Matos Inc. ("Potrero") (Potrero together with TMG, the "Corporate Partners").

Debtor owns and operates what is commonly known as El Legado de "Chi Chi" Rodriguez Golf Resort (the "Resort" or "El Legado"), located in a 285-cuerda parcel in the Jobos ward of the southern municipality of Guayama, Puerto Rico. With international renowned golfer Juan "Chi Chi" Rodríguez as its public face, the Resort was originally envisioned as developing into one of the top golfing resorts in Puerto Rico, and the Caribbean.  The concept was to develop a mixed use complex and offer residents, visitors and guests a wide range of residential, commercial and tourist amenities anchored by a championship-level based golf course with panoramic views of the surrounding area.

The Resort's master plan consisted of two phases. A first class 7,213 yard 18-hole golf course with driving range and 3 practice greens, a two-story 33,000 sq. ft. clubhouse, and a golf school with its own separate facilities and state-of-the-art equipment, the first phase also contemplated the construction of 318 residential villas and tennis courts, swimming pools, and multiple dining facilities to complement both the tourist and residential components.   Moreover, trail riding, Shetland pony rides, and 'Paso Fino' exhibitions were to be part of the Resort's amenities and daily entertainment.   These would be based in an equestrian center located within the premises of El Legado.   The second phase of the development envisaged the construction of a five-star hotel within the premises of El Legado and a marina and beach club in a nearby location to be determined at a later date, as well as 100 additional residential villas and a commercial center to be accessible from the Guayama expressway, which runs parallel to the northern edge of the parcel.

As of the November 7, 2008, the Bankruptcy Petition Date (the "Petition Date"), the Resort only consists of a 18 hole golf course and driving range (the "Golf Course"), temporary clubhouse facilities, 184 residential units (the "Units"), 108 of which have been sold to third parties (the "Sold Units") and 76 require restoration and upgrades in order to be sold (the "Unfinished Units").   The Units are located in 23 separate buildings. The Resort includes a gated guard house, front entrance and a network of internal roads connecting all of the Resort components to each other.   Common amenities include green areas, a lake, a swimming pool, and overflow parking and golf cart paths and parking spaces.   In addition, the Resort includes an approximately 10 cuerdas site

for a hotel and casino (the "Hotel Parcel") and an approximately 55 cuerdas site for future residential development (the "Future Residential Parcel").

## 4.2     Events Preceding Debtor's Chapter 11 Filing

Since the beginning of its operations in 2004 El Legado had difficulties meeting its financial obligations due to a confluence of economic and operational factors. First, the project's goals, as set out by the original master plan, were far too ambitious and ultimately unfeasible in the area where the Resort is located. Specifically, the scope of what was envisioned as the Resort's first and second phase of development was much too grand and the viability and financial projections that backed them up were overly optimistic.

Once operations commenced, bad business decisions and the absence of cooperation between the managing partners affected both the marketing of El Legado – and thus its ability to attract visitors to its golf course and secure purchases of its residential villas – and the day-to-day administration of the resort. For instance, The real estate company that the Resort's operating managers contracted to promote and sell El Legado's residential villas – Bonnin Realty – did not possess experience selling to the U.S. market. Considering that the Resort was designed to appeal to buyers in that market, this, at best, misinformed and short-sighted decision severely limited El Legado's potential profit from the sale of villas. All this speaks to serious deficiencies on the part of those that claimed to possess the experience to make informed business decisions as well as to the lack of an integrated and comprehensive short-, medium-, and long-term development and operational plan. Accordingly, administrative neglect led to the deterioration of the Resort's facilities and amenities which in the long-run

further affected the reputation and marketability of El Legado.  These events combined with the economic recession caused a dramatic downturn in demand for Debtor's product.

The severe recession of the economy of Puerto Rico and the U.S. and the concomitant deterioration of both the real estate and tourist market are certainly responsible for many of the Resort's difficulties.  In Puerto Rico the economic recession started in 2006.  According to figures provided by the Puerto Rico Planning Board, GDP contraction has accelerated over the last three (3) fiscal years going from -1.2% growth during the 2007 fiscal year to -3.7% during the 2009 fiscal year.  The Planning Board's most current estimates point to a contraction of -3.6% during the 2010 fiscal year with a return to positive growth the following year.  Other indicators paint a more detailed picture of how difficult this economy has been.  The total number of private construction permits, for instance, has fallen 41% since 2006 and their total value a slightly steeper 43%.[1]  Not surprisingly, cement sales have fallen 47% over the same span.[2]  The unemployment rate, meanwhile, has risen four (4%) percentage points to fifteenth (15%) of the labor force in 2009[3] while overall bankruptcies have doubled from a total of 5,436 in 2006 to 11,293 during the 2009 calendar year.[4]  Given these factors, leisure travel and demand for local tourism came to a halt.

The U.S. recession began later but what is most relevant for this discussion is that has been most difficult on the same middle-income travelers that make up a large percentage of total visitors to Puerto Rico. The combination of a significant rise in oil

---

[1] Percentages were calculated from data provided by the Puerto Rico Planning Board using calendar year totals.
[2] Government Development Bank ("GDB").
[3] Department of Labor and Human Resources
[4] U.S. Bankruptcy Court for the District of Puerto Rico.

prices and the severe economic downturn has had a particularly damaging effect on the airline industry as well and led many airlines to eliminate some long-established routes and hold-off on previously planned expansions.   As it concerns Puerto Rico, this resulted in a decrease in the level of overall accessibility and an increase in the overall cost of traveling to the island which further depressed the total number of arrivals to the island.   The hospitality industry in general suffered accordingly and this of course was an additional factor working against the successful operation of El Legado.

This unavoidable economic reality – which stands in sharp contrast to the market characteristics that prevailed when El Legado first obtained financing and began construction – placed strong downward pressure on disposable income and negatively affected the availability of credit.   As already detailed, this has resulted in a glut of available residential properties on the island and a sharp fall in the number of people with the means to purchase them.   This rise in inventory and decrease in demand complicated the sale of El Legado's remaining villas.   The precipitous drop of home prices throughout the U.S. and its concomitant effects on the personal finances of home owners also made the sale of villas in that market an uphill climb.

Accordingly, the persistent economic deterioration in Puerto Rico's economy did not attract any substantial revenues.   Furthermore, significant increases in the per-unit costs of utilities (especially electricity, which has affected all of Puerto Rico) have substantially contributed to the Debtor's increased operating expenses and worsened financial condition.   After several attempts to market the golf course and sale of villas Property by contractors hired by the management for this purpose, it became evident that the economic conditions in the United States and Puerto Rico were not conducive

for Debtor's business to succeed.

The combination of poor economic conditions in Puerto Rico with an inexperienced and ineffective management team resulted in El Legado being unable to meet its financial obligations. In sum, the Resort was suffering significant operating losses, operations were not profitable, and was worth far less than the amount of the secured claims asserted against it. Consequently, on December 7, 2008, El Legado was forced to seek bankruptcy protection under Chapter 11 of the United States Bankruptcy Act.

Subsequent to the Petition Date, Mr. Rodríguez retained McConnell Valdes Consulting, Inc. ("Consulting") as financial consultant in connection with the preparation, approval, and implementation of a plan of reorganization for the orderly development of the Resort.[5]

### 4.3    Debtor's Post-Petition Endeavors

The bankruptcy petition was filed on December 8, 2008, as an involuntary case under the provisions of Chapter 11 of the Bankruptcy Code. Following the Petition Date and as part of the process, on February 4, 2009, Potrero and TMG filed an "Answer to Petition" informing the Court that they would raise no objection to the petition. See Docket No. 28. Subsequently, and by having no objection, on February 6, 2009, the Court entered the "Order for Relief" as to Debtor. See Docket No. 32.

On April 29, 2009, the U.S. Trustee filed the "United States Trustee's Notice of Appointment of Unsecured Creditor's Committee" whereby Brenti Corporation, Inc., Blasus Communications and Agro Servicios, Inc. were appointed to serve in the

---

[5] For an overview of Consulting's services and representative clients please refer to **Exhibit C**.

committee.  See Docket No. 70.  In addition, on June 26, 2009, the Court extended the exclusivity period until August 31, 2009.  See Docket No. 78.

On July 24, 2009, secured creditor Westernbank filed a "Motion for the Appointment of an Operating Trustee under section 11 U.S.C. 1104" ("Motion for Appointment of a Trustee").  See Docket No. 125. Following, Westernbank motion, on August 14, 2009, creditor Joaquín López Cámara, and Potrero and TMG, partners of El Legado, filed a "Motion in Agreement for Appointment of an Operating Trustee".  See Docket No. 149.

To resolve the issue of an Operating Trustee, a stipulation was filed on September 12, 2009, between Debtor (including its partners), the Unsecured Creditors Committee and Westernbank, seeking the appointment of an operating Trustee under section 11 U.S.C. 1104.  The Stipulation was approved by the Honorable Court on September 15, 2009; (see Dockets No. 186 and 196); and on October 20, 2009, Wigberto Lugo Ménder was approved by the Court as the Chapter 11 Trustee for this case. See Docket No. 208.

Since the date of the appointment, the Chapter 11 Trustee has continued operating Debtor's business and property pursuant the provisions of 11 U.S.C. Section 1106 and 704.  The immediate business income activities pursued at the estate's property are the operation of a golf course and the lease, under either daily or short term agreements, of residential villas located at the residential complex.

As already stated, within the business activities conducted at the property known as El Legado de Chi Chi Rodríguez, is the rental of villas apartments owned by the debtor.  At the present time, the estate has in inventory 16 villas, fully furnished with all

residential amenities, which are being leased in short term lease contracts mainly to contractors working at pharmaceutical companies located nearby the complex.  As of January 1, 2010, all 16 villas were leased, thus generating rental income.  Said funds are used to cover daily operations at the property and ongoing reorganization expenses which are being incurred.

### 4.4    Employment of Professionals

On May 7, 2009, Debtor filed its application to employ attorney Jorge Luis Gerena Mendez as attorney for Debtor.  See Docket No. 72. By order dated May 20, 2009 such application was granted.  See Docket No. 73

On June 7, 2009, Debtor's counsel filed an application to employ as special counsel in state court foreclosure proceeding in Guayama Superior Court  Roberto Santiago Bolorín for Debtor.  See Docket No. 85. By order dated June 25, 2009 such application was granted.  See Docket No. 95.

On June 18, 2009, the Creditors' Committee filed an application to employ attorney Javier Pérez López as attorney for Creditors' Committee.  See Docket No. 90. By order dated July 13,, 2009 such application was granted.  See Docket No. 111.

On June 29, 2009, Debtor filed an application to employ Martita Rolón as accountant for the Debtor.  See docket No. 97. By order dated July 23, 2009 such application was granted.  See docket No. 124.

## V.    DEBTOR'S FINANCIAL INFORMATION

As of the Petition Date, Debtor owned assets and had liabilities, as more particularly described in its schedules and statement of financial affairs, which Debtor

*El Legado Golf Resort (S.C.) S.E.*
Disclosure Statement

**Case No. 08-08231(BKT)**
Page 23 of 72

filed with the Bankruptcy Court on February 29, 2009. See Docket No. 44.

Subsequently, on July 2, 2009, Debtor filed amended schedules and amended

statement of financial affairs (collectively the "Schedules"). See Dockets No. 101 & 103.

The information contained in the Schedules is summarized as follows.[6]

## 5.1   Partners and Principal Operating Officers

The following is a table of Debtor's principal Partners and Operating Officers with

their corresponding percentage of ownership equity.

|  | % of Ownership |
|---|---|
| Juan A. Rodríguez Vilá | 75% |
| T-MG Inc.<br>Principal - Mr. Joaquín López Camara | 15% |
| Potrero Matos Inc.<br>Principal - Mr. Joaquín López Camara | 10% |

## 5.2   Assets

### Real Property & Equipment[7]

As of the Petition Date, according to Debtor's Schedules, El Legado was the fee

simple owner of the Golf Course[8] and surrounding land totaling, in the aggregate,

approximately 285 cuerdas located in Guayama, Puerto Rico. Debtor listed such real

property as having an approximate aggregate value of as of the Petition Date of $65

million. However, preliminary expert evaluations that Consulting has obtained, reflect

---

[6] Debtor's Schedules and Statement of Financial Affairs and are available for public inspection at the office of the
Clerk of the Bankruptcy Court, during regular business hours.
[7] For a detailed description of El Legado's office equipment and furnishing, please refer to **Exhibit D**.
[8] According to the Schedules the Golf Course includes an 18 holes golf course and driving range, 76 unsold villas, a
pro-shop, a clubhouse and a cafeteria.

that given the visibly deteriorated state of the property, the need of substantial repairs and the effects of the economy on the local and stateside current real estate market, the market value of the property has reduced the property's value. Accordingly, Consulting estimates that as of April 20, 2010, the real property, golf course, buildings and improvements, owned by Debtor have an approximate aggregate market value of $13 million. See Analysis of estimated real market value of El Legado prepared by Consulting attached hereto as **Exhibit E**.

### Personal Property

As of the Petition Date, Debtor's Schedules listed it as having total personal property of approximately $110,568.31 consisting of cash, checking, savings and other financial accounts, security deposits, accounts receivable, liquidated debts, and inventory. In liquidation, as a result of rejection or termination of the lease contracts, leasehold improvements become property of the landlords.

### Accounts Receivable and Liquidated Debts

As of the Petition Date, Debtor did not list any accounts receivable or liquidated debts. Debtor does have a cause of action for lender liability pending in State Court against Westernbank for an aggregate amount of $61,500,000.

**5.3   Liabilities**:

A detail of all prepetition debts, as classified by Debtor is provided in the schedule of payments under the Plan enclosed as **Exhibit F**.

**5.4   Pending Litigation and Other Liabilities:**

Pending or threatened litigation that may affect the liability composition of the business is as follows.

<u>Miguel Bonnin Loubriel, et. als. v. Puerto Rico Golf Resort, S.E., GAC 2006-0131</u>

This commenced in the Puerto Rico First Instance Court - Guayama as a breach
of contract.  Among its allegations, the plaintiff argues that he was obstructed in his
duties as a Realtor, that he was forced out of the residential projects and that a third
party is obstructing the business transactions.  For these and other related allegations,
the Plaintiff is seeking over $1.1 million.  The case is currently stayed as it relates to the
bankruptcy proceeding and case of El Legado - case number 08-08321-BKT 11.
However, Plaintiff has continued to prosecute the case as to Mr. Rodríguez and his
spouse.  Despite receiving notice of the filing of the El Legado bankruptcy, plaintiff failed
to file a proof of claim by the bar date.  Debtor also reserves the right to file an action for
damages against Plaintiff for violation of the automatic stay.

<u>Jesús Rodríguez Vilá, et. als. v. Puerto Rico Golf Resort, S.E., GAC 2006-0276</u>

This commenced in the Puerto Rico First Instance Court - Guayama as a breach
of a service contract.  Among its allegations, the plaintiff argues that he performed
activities as an administrator, which he contracted with Mr. Juan A. Rodríguez Vilá to
perform such services for a professional service fee contract and that later on the
service was interrupted and never received payment for his services. For these and
other related allegations, the Plaintiff is seeking over $157,000 in damages.  The case is
currently stayed as it relates to the bankruptcy proceeding and case of El Legado - case
number 08-08321-BKT 11.

<u>Cruz Consulting Group, Inc. v. El Legado de Chi Chi Rodríguez, et. als. ECD
2007-0247</u>

This commenced in the Puerto Rico First Instance Court - Caguas as a breach of
a service and equipment contract.  Among its allegations, the plaintiff argues that he

installed telecommunications equipment for the residential complex for a total value of $125,000, and it has not received payment for this service. For these and other related allegations, the Plaintiff is seeking over $130,000. The case is currently stayed as it relates to the bankruptcy proceeding and case of El Legado - case number 08-08321-BKT 11.

  Brenti Construction, Inc. v. El Legado de Chi Chi Rodríguez, et. als. GCD 2008-0290

      This commenced in the Puerto Rico First Instance Court - Guayama as a breach of a construction contract. Among its allegations, the plaintiff argues that it had a construction agreement to develop the second phase of the residential units. Further, the plaintiff alleges that it has over $925,000 of certified work done and he has not received payment for this work. Therefore, for these and other related allegations, the Plaintiff is seeking over $925,000. The case is currently in the discovery phase. However, an order to stay the proceedings was entered as it relates to the case of El Legado - case number 08-08321-BKT 11.

  Westernbank v. El Legado de Chi Chi Rodríguez, et. als. GCD 2008-0228

      This commenced in the Puerto Rico First Instance Court - Guayama as a breach of the loan agreement. Among its allegations, the plaintiff argues that it had a loan agreement and that Debtor has failed to comply with it. Therefore, for these and other related allegations, the Plaintiff is seeking over $25 million. The case is currently in the discovery phase. An order to lift the stay was entered as it relates to the case of El Legado - case number 08-08321-BKT 11 to allow Westernbank to continue to litigate up to the judgment phase. Westernbank may not move for execution of any judgment

without prior authorization of the bankruptcy court.   Moreover, all defendants have counterclaimed Westerbank based on lender liability causes of action.

<u>Asociación de Residentes v. El Legado de Chi Chi Rodríguez, et. als. GCD 2008-0347</u>

This commenced in the Puerto Rico First Instance Court - Guayama as a breach of an administrative contract.  Among its allegations, the plaintiff argues that Debtor had the obligation to make all payments for administrative expenses. Therefore, for these and other related allegations, the Plaintiff is seeking over $200,000 and the sum of $14,000 monthly backdated until present time.   The case is currently is in the preliminary stages just before the discovery phase.  An order to stay the proceedings was entered as it relates to the case of el Legado - case number 08-08321-BKT 11. Debtor disputes the legality of the claim.

<u>Blasus Professional and Communications Services Corp., t/c/c Blasus Communications Group; Héctor de Jesús Hill; David Rivera Espinel v. Juan Rodríguez Vilá, su esposa Iwalani Rodríguez y la Sociedad Gananciales Compuesta por Ambos; Asociación de Condómines de El Legado Golf Resort; Compañías X, Y, Z GPE 2009-0063</u>

This commenced in the Puerto Rico First Instance Court - Guayama as a breach of a service contract.  Among its allegations, the plaintiff argues that Mr. Rodríguez contracted with another TV Cable provider violating the agreed upon contract with Blasus.   Further, the Chapter 11 Trustee was obliged by Blasus' actions to file an adversary proceeding and to seek out an injunction against Blasus, because as alleged by the Trustee the constant violations of the automatic stay under the Bankruptcy Code provisions.  Also, the Trustee is seeking for the Bankruptcy Court to disallowed the over $485,000 in back pay that is currently owed to Blasus.  An order to stay the proceedings

was entered as it relates to the case of El Legado - case number 08-08321-BKT 11.

The case is active as to non-debtor defendants.

## 5.5    Leases and Contracts

As of the Petition Date, Debtor was a party to a verbal leasing agreement

regarding golf carts with Chilani Agricultural Development, as set forth in Schedule G to

Debtor's Schedules.

## VI. THE REORGANIZATION PLAN

Debtor and Mr. Rodríguez propose the following joint plan of reorganization (the

"Plan") for the resolution of the outstanding claims against and interests in the above-

captioned Debtor.    The Plan contemplates obtaining a capital infusion from Mr.

Rodríguez of $1,000,000 and a post-petition financing of not less than $9,614,804 under

Section 364 of the Bankruptcy Code, in order to obtain working capital of not less than

$10,614,804.00 providing funds sufficient to continue with the reorganization process.

This financing is of essential importance to the ongoing operation of Debtor's business

and to the success of the reorganization.    Proponents are providing consideration

sufficient to pay allowed administrative expenses and allowed priority claims in full, and

to restructure certain secured claims in order to provide lender adequate protection for

its payment.

In addition, all of Debtor's assets will be transferred to NewCo (as further defined

below), which will own the Resort and continue with the Golf Course operations as a

going concern by engaging the services of a qualified management company in order to

execute a business plan based upon a series of strategic initiatives, the principal

aspects of which are summarized below.    A New Management Team, which will have

the discretion, in its business judgment, to manage the Company as it sees fit. There

can be no assurance that the New Management Team will decide to manage the Debtor

in a manner that is consistent with the current management's business strategy.

In essence, Proponents' Plan consists of five clear steps: rehabilitation of and

improvements to the 76 unsold villas; rehabilitation to and improvements to El Legado

de "Chi Chi" Golf Course and reorganization of its membership association;

establishment and marketing of a condo-hotel program; marketing and sales program

for unsold villas; and finally the establishment of the "Chi Chi" Golf Academy. Moreover,

(as previously mentioned) the substantial infusion of capital as well as expertise in the

management team are the necessary components for a successful reorganization.

## 6.1.   <u>Overview of Chapter 11</u>

Chapter 11 is the principal business reorganization chapter of the Bankruptcy

Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its

business for the benefit of itself, its creditors, and interest holders. Another goal of

chapter 11 is to promote equality of treatment for similarly situated creditors and

similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of

all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy

Code provides that the debtor may continue to operate its business and remain in

possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a

chapter 11 case. A plan of reorganization sets forth the means for satisfying claims

against and interests in a debtor. Confirmation of a plan of reorganization by the

Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

## 6.2    Overall Structure of the Plan

Proponents believe the Plan provides the best and most prompt possible recovery to the Debtor's Claim and Interest Holders. Under the Plan, Claims against and Interests in the Debtor are divided into different classes.  If the Plan is confirmed by the Bankruptcy Court and consummated, on the Distribution Date, and at certain times thereafter as Claims are resolved, liquidated or otherwise allowed, the Debtor will make distributions in respect of certain Classes of Claims and Interests as provided in the Plan.  The Classes of Claims against and Interests in the Debtor created under the Plan, the treatment of those Classes under the Plan and distributions, if any, to be made under the Plan are described below.

## 6.3    Classification and Treatment of Claims and Interests

The Plan has been drafted designating five (5) classes in accordance with the dispositions of 11 U.S.C. 1122 and 1123. Creditors are identified by Proponents under each class. All creditors and other parties in interest are urged to read and consider the Plan in full inasmuch as it represents a proposed legally binding agreement with the Debtor and any other parties involved.

### 1.    Unclassified Claims

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified in the Plan. A description of the unclassified claims and the claims in each class, as well as the estimated principal amounts of each as of the Effective Date and their treatment, are set forth in the Plan. Administrative Expense Claims are generally the ordinary and necessary costs of administering and operating during a Chapter 11 case.

### 2.    Administrative Expense Claims

Except as otherwise agreed to by Debtor and the holder of an Allowed Administrative Expense Claim, each such holder shall be paid in full in Cash on the later of (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms and (ii) the Effective Date. This does not include costs and expenses related to the sale of Debtor's real estate, which are projected to be paid upon the sale of Debtor's realty.

Any pending United States Trustee's quarterly fees shall be paid in full pursuant to 11 U.S.C. § 1930 on or before the Effective Date. The professionals retained in Debtor's Chapter 11 case by Debtor have and will incur in fees and expenses from the date of their retention through the Effective Date of the Plan. It is impossible to predict

the amount of additional professional administrative expense fees that will be incurred through the Effective Date of the Plan. All amounts paid to professionals through the Confirmation Date, including interim fees and expenses already paid are subject to final Bankruptcy Court approval.

All fees and expenses of Professionals for services rendered after the Confirmation Date in connection with the Bankruptcy Case and the Plan including, without limitation, those relating to the occurrence of the Effective Date, shall be paid by Debtor upon receipt of reasonably detailed invoices therefore in such amounts and on such terms as such Professionals and Debtor may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order. Debtor estimates that additional Allowed Professionals Fee Claims will aggregate around $70,000.00 for unpaid services rendered and expenses incurred up to the Effective Date of the Plan, including those of the Creditors Committee's professionals. All amounts paid to professionals through the Effective Date of the Plan, including interim fees and expenses already paid are subject to final Bankruptcy Court approval.

Proponents reserve the right to contest the allowance of any professional fees. If Debtor or the Reorganized Debtor disputes any portion of an Administrative Expense Claim, Debtor or the Reorganized Debtor shall pay such Claim within thirty (30) days after the entry of a Final Order with respect to the allowance of such disputed Administrative Expense Claim.

### 3.    Priority Tax Claims

Priority Tax Claims are Claims entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. Such Priority Tax Claims consist of income, real estate and other

miscellaneous taxes accrued prior to the Petition Date. At Debtor's election, holder of an Allowed Priority Tax Claim, shall receive in full satisfaction thereof an amount in Cash equal to the Allowed amount of such claim on, (i) the dated such claim becomes Allowed or, (ii) the Effective Date of the Plan.

The estimated potential Priority Tax Claims are listed in **Exhibit F** in the amount of $682,526,68.

## 6.4    Classes of Claims and Equity Interest

As of the Petition Date, Debtor had secured debt, priority unsecured debt and non-priority unsecured debt, as more particularly described below. In addition Debtor will incur in a post-petition super priority claim. The Plan classifies the various claims against Debtor.   A description of all classes of Claims and the Equity Interest, the estimated principal amounts of each Class as of the Effective Date and its treatment are set forth below.   The Classes of Claims and the Interest established in the Plan are as follows:

**Class 1**          **Post-Petition Financing Super Priority Claim** (Senior Loan) Subject to the Court's approval as provided by § 364 of the Bankruptcy Code, this class shall consist of allowed post-petition financing on moneys lent by a Financial Institution to Debtor. Upon certain post-petition Credit Agreement and, after notice and hearing, approval of the Bankruptcy Court, a Financial Institution will provide working capital of not less than $9,614,804 for the completion of residential villas, refurbish of the Golf Course, and partially fund reserves for the operation of the Reorganized Debtor.

The new credit facility will be originated as a non-revolving line of credit for construction purposes which will convert into a five year term loan upon completion of construction. This loan shall be for the payment of the aforesaid items and shall accrue interest at the rate provided for in the Plan. To assure the payment of the Class 1 claim, on the Effective Date, Debtor will issue such notes, mortgages, assignments, and other security document as may be required by the lender as a Senior Lien on all assets of the Debtor or Reorganized Debtor. Debtor is currently actively seeking to secure this post-petition financing and has set a goal to secure a financing commitment within ninety (90) days from this date to evidence the source of these new funds.

**Class 2**          **Westernbank´s Secured Claim**

To finance the construction and management of el Legado, Debtor signed with Westernbank a contract on March 21, 2002, entitled "Consolidation, Land Acquisition, Golf Course, Villas, Site and Construction Loan Agreement" (hereinafter, the "First Contract"). This First Contract is identified as loan number 797-0013-731. Through the First Contract, Westernbank's financed Debtor's purchase of certain land and the construction project known as "El Legado de Chi Chi Rodríguez Golf Resort", in Guayama, Puerto Rico. As will be later explained in detail, to guarantee the financing obtained in the First Contract, Westernbank received several

mortgages notes and guarantees signed by Debtor Mr. Rodríguez, Iwalani Rodríguez ("Mrs. Rodríguez"), Potrero, TMG, Joaquín López Cámara ("Mr. López") and his wife María Elena Matos ("Mrs. Matos") (hereinafter collectively, the "Guarantors"). On April 1, 2008, as operations advanced, while being in a precarious financial position, Westernbank sent a notice of default addressed to Debtor and all other guarantors. Whereby it declared Debtor in default and notified its intentions to exercise its right to, among other things, accelerate payment of, and collect on, all amounts due under all the aforementioned loans and to foreclose on its collateral under the loan documents. In response to Westernbank's actions, the Debtor and Guarantor disputed that they were in default of their obligations under the various Financing Agreements and Loan Documents with Westernbank. Westernbank of Puerto Rico is listed having a Allowed Secured Claim in the amount of $10,000,000.00, and at Debtor's election, it shall be paid out by agreed upon terms, in full through regular installment payments in Cash or total value equal to the allowed amount of such claims over a period ending not later than ten (10) years after the closing date, including interest of 8% *per annum*.

The unsecured portion of Westernbank's claim in the amount of $16,761,353.64 is dealt as a Class 3 General Unsecured Claim.

**Class 3**          <u>**General Unsecured Creditors**</u>

This class consists of all allowed undisputed, noncontingent unsecured claims listed in the Debtor's petition or as otherwise approved by the Court.   This class includes Westernbank's deficiency from its secured claim in the sum of $16,761,353.64. The General Unsecured Claims are listed in **Exhibit F** in the amount of $19,217,328.16.  Unless the Holder of such Claim and the applicable Debtor agree to a different treatment, at Debtor's election, each Holder of an Allowed General Unsecured Claim will receive on its Claim its Pro Rata Share of the Allowed Claim ($250,000.00) at year seven (7) after the closing date.

**Class 4**          **General Unsecured, Contingent & Disputed Claims**

This class consists of general unsecured creditors.  The estimated potential General Unsecured Contingent & Disputed Claims are listed in **Exhibit F** in the amount of $7,707,007.36

**Class 5**          **Equity Security and/or Other Interest Holders**

This class includes all equity security and interest holders. The estimated potential of Equity Security and Other Interest Holders potential are listed in **Exhibit F** in the amount of $6,986,911.00.

## 6.5   **Treatment of Claims**

The Plan has been drafted designating five (5) classes in accordance with the dispositions of 11 U.S.C. 1122 and 1123.  Creditors are identified by Debtor under each class, even though the Debtor is proposing a joint plan of reorganization.  All creditors and other parties in interest are urged to read and consider the Plan in full inasmuch as

it represents a proposed legally binding agreement with the Debtor and any other party

involved.  The classes of creditors are as follows:

### Class 1    Superpriority Claim

(a)    <u>Impairment and Voting</u> Class 1 is unimpaired under the Plan and

is not entitled to vote to accept or reject the Plan.

(b)    <u>Distribution</u> Unless otherwise agreed to by a holder of an Allowed

Superpriority Claim, each such holder, shall receive Cash in an amount equal

to the Allowed Superpriority Claim pursuant to the following: monthly payments

of interest, principal due in full at maturity.  Mandatory prepayments equal to: (i)

90% of Net Unit Sales Proceeds, and (ii) 90% of Net Parcel Sale Proceeds, or

as soon thereafter as is practicable. Interest to be repaid by budgeted

construction interest reserve.

### Class 2    Westernbank's Secured Claim

(a)    <u>Impairment and Voting</u> Class 2 is impaired under the Plan and

thus is entitled to vote or reject. Westernbank will be entitled to vote to accept

or reject the Plan. In the event Class 2 votes to reject the Plan, the below

distribution shall be forfeited.

(b)    <u>Distribution</u> At Debtor's election, Westernbank's Secured

Claims, shall be paid either (i) upon such terms as may be agreed to with

such holder or (ii) in full through regular installment payments in cash of a total

value, as of Effective Date of the Plan, equal to the allowed amount of such

claims over a period ending not later than ten (10) years after the closing date,

including interest of 8% per annum. The unsecured balance equal to

$16,761,353.64 is dealt as a Class 3 General Unsecured Claim.

### Class 3        General Unsecured Claims

(a)    Impairment and Voting Class 3 is impaired under the Plan and thus is entitled to vote or reject.

(b)    Distribution Unless the Holder of such Claim and the applicable Debtor agree to a different treatment, at Debtor's election, each Holder of an Allowed General Unsecured Claim will receive on its Claim its Pro Rata Share of the Allowed Claim ($250,000.00) at year seven (7) after the closing date.

### Class 4        General Unsecured, Contingent & Disputed Claims

(a)    Impairment and Voting Class 4 is impaired under the Plan and thus is entitled to vote or reject.

(b)    Distribution Unless the Holder of such Claim and the applicable Debtor agree to a different treatment, on the Effective Date, Holders of a General Unsecured Contingent and Disputed Claim will be discharged and cancelled and the Holders of a General Unsecured Contingent and Disputed Claim shall not receive or retain any distribution on account of such other interests.

### Class 5        Equity Interest Holders

(a)    .Impairment and Voting. Holders of Equity Interest in Debtor will not be entitled to vote to accept or reject the Plan in accordance with Section 1126(g) of the Bankruptcy Code.

(b)    Distribution Unless the Holder of such Claim and the applicable Debtor agree to a different treatment, on the Effective Date, Holder Equity

Interest will receive no distribution and retain no rights or property on account of their Equity Interest which shall be deemed extinguished on the Effective Date. The shares of these holders will be cancelled on the Effective Date.

## 6.6    Method of Distributions Under the Plan

### 1.      Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims as of the Effective Date, shall be made on the Effective Date or as soon thereafter as is practicable. Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Notwithstanding the date on which any distribution of securities is made to a Holder of a Claim, as of the date of the distribution such Holder shall be deemed to have the rights of a Holder of such securities (subject to the terms and conditions of the Plan) distributed as of the Effective Date.

### 2.      Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

### 3.      Distributions by the Disbursing Agent

Reorganized Debtor or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtor or the Disbursing Agent is notified in writing of such Holder's then current address.

(ii) <u>After Distributions Become Deliverable</u>. The Disbursing Agent shall make all distributions that have become deliverable or have been claimed since the Distribution Date as soon as practicable after such distribution has become deliverable or been claimed.

(iii) <u>Failure to Claim Undeliverable Distributions</u>. Any Holder of a Claim or Interest that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed distribution against the Debtor or its Estate, the Reorganized Debtor or its property. Nothing contained in the Plan shall require any Disbursing Agent, including, but not limited to, the Reorganized Debtor, to attempt to locate any Holder of a Claim or Interest.

**6.**     **<u>Allocation of Plan Distributions Between Principal and Interest</u>.**

To the extent that any Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

Other than as specifically set forth below, the Disbursing Agent or applicable Indenture Trustee or the administrative agent under shall make all distributions required to be made under the Plan. The Reorganized Debtor or NewCo may act as Disbursing Agent or may employ or contract with other entities to assist in or make the distributions required by the Plan.

### 4. Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution on account of a Claim, each Holder of an instrument evidencing a Claim (a "Certificate") shall be deemed to have surrendered the Certificates, or, with respect to indebtedness that is governed by an agreement and administered by an Indenture Trustee, agent, or servicer (each hereinafter referred to as a "Servicer"), the respective Servicer, and such Certificate will be cancelled solely with respect to the Debtor and such cancellation will not alter the obligations or rights of any non-Debtor third parties vis-a-vis on another to such instruments. Servicer may (but shall not be required to) request that registered Holders of Certificates surrender their Certificates for cancellation.

### 5. Delivery of Distributions and Undeliverable or Unclaimed Distributions

(a) Delivery of Distributions in General

Distributions to Holders of Claims and Interests shall be made at the addresses set forth in Debtor's records unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001.

(b) Undeliverable and Unclaimed Distributions

(i) Holding and Investment of Undeliverable and Unclaimed Distributions.

If the distribution to any Holder of a Claim or Interest is returned to the

### 7. <u>Withholding and Reporting Requirements.</u>

In connection with the Plan and all Distributions under the Plan, the Disbursing Agent or Reorganized Debtor shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding, payment, and reporting requirements. The Disbursing Agent or Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder. All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and withholding of such taxes. For example, with respect to any employee-related withholding, if the Debtor are obligated by law to withhold amounts from Distributions to a present or former employee to satisfy such present or former employee's tax and other payroll obligations, the Disbursing Agent may withhold a portion of the Distributions allocated to the Holder of an Allowed Claim that is a present or former employee, whether or not such Distributions are in the form of Cash, in such amount as is determined necessary to satisfy such Holder's tax and other payroll obligations with respect to the Distributions.

Notwithstanding any other provision of the Plan, except to the extent withheld from Distributions to the Holder, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the

satisfaction and payment of any tax obligations imposed by any governmental unit,

including income, withholding, and other tax obligations, on account of such Distribution,

and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan

unless and until such Holder has made arrangements satisfactory to the Disbursing

Agent for the payment and satisfaction of such withholding tax obligations or such tax

obligation that would be imposed upon the Plan Administrator in connection with such

Distribution. Any property to be distributed pursuant to the Plan shall, pending the

implementation of such arrangements, be treated as an undeliverable Distribution

pursuant to the Plan.

### 8.    Setoffs.

The Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code or

applicable nonbankruptcy laws, but shall not be required to, set off against any Claim or

Interest, the payments or other distributions to be made pursuant to the Plan in respect

of such Claim or Interest, the claims of any nature whatsoever that the Debtor or the

Reorganized Debtor may have against the Holder of such Claim or Interest; provided,

however, that neither the failure to do so nor the allowance of any Claim or Interest

hereunder shall constitute a waiver or release by the Reorganized Debtor of any such

claim that the Debtor or the Reorganized Debtor may have against such Holder.

## 6.7    Allowance and Payment of Certain Administrative Claims

### 1.    Professional Claims

(a)    All final requests for payment of Professional Fees pursuant to Sections

327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be made by

application filed with the Bankruptcy Court and served on the Reorganized Debtor, its

counsel, counsel to the unsecured creditors' committee appointed in the case, and other necessary parties-in-interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such applications must be filed and served on the Reorganized Debtor, its counsel, counsel to the unsecured creditors' committee appointed in the case and the requesting Professional or other entity on or before the date that is thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

(b) Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor shall employ and pay Professionals in the ordinary course of business.

## 2.   Substantial Contribution Compensation and Expenses Bar Date

Any Person who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code shall file an application with the clerk of the Bankruptcy Court on or before the 45th day after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Debtor and the United States Trustee for the District of Puerto Rico, and such other parties as may be decided by the Bankruptcy Court on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

## 3.   Other Administrative Claims

All other requests for payment of an Administrative Claim must be filed with Debtor and served on counsel for the Proponents no later than 60 days after the Effective Date (the "Administrative Claims Bar Date"). Any request for payment of an Administrative Claim pursuant to the Plan that is not timely filed and served shall be disallowed automatically without the need for any objection from the Debtor or the Reorganized Debtor. The Debtor or the Reorganized Debtor may settle an Administrative Claim without further Bankruptcy Court approval. Unless the Debtor or the Reorganized Debtor object to an Administrative Claim within 60 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtor or the Reorganized Debtor objects to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable in the ordinary course of business.

**6.8      Reservation of Right to Object to Allowance or Asserted Priority of Claims**

Nothing in the Plan shall waive, prejudice, or otherwise affect the rights of the Debtor, the Reorganized Debtor, or the Holders of any Claim to object at any time, including after the Effective Date, to the validity or asserted priority of any Claim, including without limitation, whether any such Claim should be treated as a Subordinated Claim. Moreover, Proponents reserve the right to dispute, contest, or offset against, any Reinstated Claim following or prior to the Effective Date, either in the

Bankruptcy Court or in the ordinary course in such manner or tribunal as may otherwise be appropriate.

## 6.9  Special Provision Regarding Unimpaired Claims

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtor or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

## 6.10 Procedures for Resolving Disputed, Contingent, and Unliquidated Claims

The Debtor and Reorganized Debtor may contest the amount and validity of any disputed, contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Case had not been commenced.

## VII.  THE REORGANIZED DEBTOR

## 7.1  Strategic Initiatives that lead to Reorganization

Mr. Rodríguez with the assistance of Consulting have pursued various strategic alternatives including seeking to implement debt exchanges, seeking to issue new debt for cash and/or in exchange for debt, and pursuing asset sales. Ultimately, the efforts to reach any negotiations with its noteholders were unsuccessful, however, it led to the development of this Plan to restructure Debtor with a business model that will enhance the Property's value mainly as a result of the following:

- Complete construction of remaining unsold villas and get them into "selling condition". This will maximize the price of the real estate units in a difficult market.
- Redevelopment of the golf course by addressing important matters such as the Property's water problems and establishing a long-term maintenance program for the golf course as per the recommendations of the golf consultant.
- Restructure the existing golf membership plan, with possible reciprocity from other golf courses within the island and the rest of the Caribbean through the golf consultant's existing network of golf programs.
- Establish a condohotel rental program managed by a third party professional condohotel management company (Key Management) which will provide the Property with an improved income stream.

## 7.2    <u>The Business Plan</u>[9]

Proponents and Consulting believe that El Legado has many features that favor a successful reorganization and long-term operational viability.  Foremost among these are El Legado's geographic location which enjoys optimum golf playing conditions; the overall golfing experience it can offer residents and guests; its link to a high-profile celebrity and the branding and marketing opportunities that arise from it; and finally, its existing infrastructure and relevant land use permits.

Moreover, as is detailed in the financial projections (see **Exhibit H**), Consulting has already identified subsidies, incentives, and tax credits that the Resort is eligible to receive through the Workforce Investment Act (WIA) as well as from the Puerto Rico Tourism Company (PRTC), and the local tax collecting agency, or 'Hacienda.'  Under Proponents' Plan the tax credits will be reinvested into the Resort to help bring it up to standards while the subsidies and incentives, which apply to payroll and marketing expenses, will help stabilize the Resort's finances during the period subsequent to its reorganization under new management.

---

[9] For a detailed discussion on the Marketing Plan please refer to **Exhibit G** and **J**.

In spite of the Resort's current financial problems and the hurdles these place on its continued operation, the fact remains that the most critical and capital intensive components (i.e. the basic infrastructure) of a first-class golf resort have already been constructed.  While additional financial outlays are necessary in order to rehabilitate El Legado's golf course, its residential components, and amenities, the Plan thoroughly details the manner in which it is possible to work from this strong material foundation to create a highly marketable golf resort.  It would be a shame that with a responsible and forward-looking Reorganization Plan available, the time and money that already has been invested in this project go to naught, especially since this would result in substantial and unrecoverable losses.  As will become evidently clear, the Plan is undoubtedly what is in the best interests of El Legado and its creditors.

Faced with the current situation, assembling a competent team of professionals is priority number one.  The Plan counts with the services of highly qualified, and in some cases world-renowned, companies with vast experience and a long track record of success in the rehabilitation, furnishing, management, and marketing of resort communities similar to El Legado.  This is a crucial element of the Reorganization Plan as it assures that, on the one hand, past mistakes will not be repeated and, on the other, that high quality advice will be available when hard choices need to be made. A brief description and resume of the proposed members of the new management team is presented as **Exhibit I.**

Secondly, rather than proposing fanciful plans for continued expansion and hoping for the best the Plan sets a responsible and grounded course for El Legado's continued operation.   Building itself out of its current predicament and irresponsibly

expanding the scope of the Resort as if the original master plan were still viable, as some now propose, would be foolish and unworkable on its face.  Instead, the Plan proposes to do what is necessary to first extract full value from the property's current facilities in order to stabilize Debtor's finances in the short-term and set a strong foundation for growth down the line.  Central to the Plan is a comprehensive reworking of, one, the overall experience that El Legado currently offers residents, prospective guests, and visitors; two, its sources of income; and three, the Resort's sales and marketing plan.  As mentioned earlier, these changes will be put into practice under the guidance and supervision of industry leaders.

Moreover, Debtor will be able to reap the benefits of this improved economic environment. Encouragingly, after almost four years of precipitous decline most economic indicators are now beginning to show signs that the economy of Puerto Rico is finally approaching stabilization.  While this just means that the economy may finally have bottomed out it represents a much needed step before one can even begin to speak of real economic growth.  After also going through its worst recession since World War II, the U.S. economy is on much better footing and is once again growing, albeit slowly for its own standards.  Although it is impossible to precisely predict when the economies of the U.S. and Puerto Rico will recover in full, most projections point to the end of 2010 and/or beginning of 2011 as the period in which both will show signs of significant growth. While this is certainly good news for Debtor's future outlook, past experience demonstrates that it will not be able to reap the benefits of this improved economic environment unless wholesale changes are made beforehand.

The lack of sufficient experience in the international real estate and tourist industry resulted in an unmistakable pattern of flawed analysis and questionable decision-making that stunted El Legado's potential and that underlines the urgent need for control to be turned over to a new management team. If capable hands were in place from the very beginning things could have turned out differently, but such was not the case.  Thus as part of Proponents' Plan the Resort shall be placed under a new management team with the capabilities to make the correct decisions going forward so as to make the most of the Resort's potential as a residential and tourist development. Above all, the new management team must possess a firm understanding of prevailing economic realities as well as the experience and resume necessary to take practical steps and establish reasonably attainable targets in order for the Resort to meet its existing obligations and then turn a profit.

As part of its due diligence, Consulting requested cost estimates from Project Administration & Management Services, Inc (PAMSI) and DH Construction Corp., two prominent construction and engineering firms with established credentials on the island. According to their analysis significant work is required before the 76 unsold or unfinished villas can even be placed back on the market and additional improvements are necessary for the properties to be attractive to potential buyers.  Consulting and the Proponents have already identified the most essential improvements that must be undertaken which, among other things, include plumbing and tile work, the application of roof sealer, and the repair and possible replacement of mechanical fixtures. Furthermore, the exterior of the villas need to be pressure washed and its walls plastered and repainted and improvements must also be made to the Resort's

landscaping. As to the golf course – by far the Resort's most valuable asset and anchor attraction –it also has fallen victim to many of the same consequences of mismanagement and during the past few years has been operating without sufficient capital to cover the necessary day-to-day maintenance work that such a course requires.  Consequently, it too is in need of a wide range of repairs if is to be restored it to its original value and level of marketability.  As part of its comprehensive assessment of the property Consulting reached out to one of the most recognized golf course development and management companies in the world to obtain an objective preliminary analysis of the state of El Legado's golf course.  Southworth Development LLC has designed, consulted on, and today owns and/or operates golf course resorts and communities in Europe, the U.S., and the Caribbean.

On November 24, 2009 Southworth president and capital partner Mr. Gregory Sherwood made an on-site visit of the property.  Mr. Sherwood's extensive resume includes collaborations with some of the best developers and managers in the golf industry on many major projects throughout the world, including the highly acclaimed and exclusive Liberty National Golf Club near Manhattan.  He has extensive experience in Puerto Rico having worked on the golf course at El Conquistador Resort and Golden Door Spa in Fajardo and on the preparations for the Puerto Rico Open at the Trump International Golf Club in Rio Grande as well as on other notable golf projects throughout the island.

Mr. Sherwood's inspection, which he conducted with two technical assistants, identified several major issues with the current state of the golf course. In his professional opinion the issues that require the most immediate attention include a lack

of sufficient water and a poor irrigation system which is made worse by 2 malfunctioning water pumps; the poor condition of the golf course's sand bunkers and lake lining as well as the offsite maintenance shed; the existence of multiple safety hazards including loose wiring in the property's pump room; and a lack of proper equipment for El Legado's maintenance staff which continues to negatively affect the condition of the golf course as a whole.   Based on this assessment Consulting has received a preliminary proposal from Southworth for golf consulting services at El Legado and is now merely awaiting budget approval of the Reorganization Plan to fine tune and finalize the budget and work plan and to move ahead with the needed repairs. See A copy Southworth's Proposal attached hereto as **Exhibit J.**

The full breakdown of the all work that must be performed on the property's residential villas, golf course, and other amenities as well as the estimated costs and time necessary to complete them is provided in the financial discussion and projections section.

In regards to the Resort's residential component, the first step would be to rehabilitate and make improvements to the 76 unsold or unfinished villas.  This work will involve improvements to both the infrastructure and aesthetic quality of the properties, including its furnishings.   Said improvements will be done by either PAMSI or DH Construction Corp., and the choice between the two will depend on the cost effectiveness and quality of each company's estimates.   The furniture of the rehabilitated villas will be provided by Double Vision Hospitality Group, a company that specializes in the supply of furniture packages to the hospitality industry and that counts many of Puerto Rico's most high-end hotels as customers.   Improvements to El

Legado's existing main entrance (or the possible construction of a new one) and landscape work to the development's green areas will also be included as part of the rehabilitation of the Resort's residential areas.

While the rehabilitation of the residential component of the Resort is essential to its successful operation, its present and future viability is most dependent on the appeal of its central attraction. El Legado is, after all, a golf resort and thus its profile and marketability are functions of the quality of and services offered by its 18-hole golf course. As such, the Plan proposes a comprehensive rehabilitation of the golf course so that it conforms to the standards of its original conceptualization as one of the top courses in Puerto Rico and the Caribbean. These plans will be designed and overseen by Southworth International. This will ensure that once work is completed, the El Legado Golf Course will be of the highest possible quality and able to successfully compete for market share in the golfing tourism segment.

Southworth International has already completed a preliminary assessment of estimated hard and soft costs associated with the rehabilitation of the golf course and these cost estimates are included in the financial projections. While a second on-the-ground assessment of the golf course is required, based on Mr. Sherwood's on-site visit the Reorganization Plan identifies the following needed improvements to the golf course: the irrigation system; repairs to its lakes; the reshaping, lining, and renovating of its bunkers with high-quality sand which will be imported from Florida; eradication of mismatched grass in the greens and fairways; new yardage markers, flags, and benches; and an upgrading of its maintenance facilities.

*El Legado Golf Resort (S.C.) S.E.*                                              **Case No. 08-08231(BKT)**
Disclosure Statement                                                                         Page 54 of 72

As to the aforementioned lack of sufficient water, a preliminary contract has been signed with the Puerto Rico Electric and Power Authority ("PREPA") for the latter to supply the property with the required supply of water from the nearby irrigation canals. Finally, the golf course's clubhouse and pro-shop will also be remodeled to reflect the same high quality that the course will offer residents, guests, and visitors.

It is important to emphasize that in order to minimize the time between the start of the required rehabilitation work and when income generating activities can commence in earnest improvements on the villas and the golf course will be done simultaneously. Consulting's construction draw schedule is included in the financial projections.

Once improvements to the villas and the golf course are completed and the villas conform to the expected high-quality standards, they will be included in a condo-hotel program. This condo-hotel program will be marketed to tourists from abroad as well as residents of Puerto Rico. Its promotion and management will be administered by Key Management Group, a company that specializes in the provision of management, financial, risk management, sales and marketing, and human resource services to the hospitality industry.[10] Key Management Group's participation in the reorganization of El Legado ensures that the villas will be placed in a worldwide distribution pool and that the overall guest experience at the Resort will be of the highest quality. For a Copy of Key Management's Proposal Management Contract, see **Exhibit O.**

As the financial projections show, the operational viability of El Legado does not rest on overly optimistic projections. See **Exhibit H.** Due to the difficult economic environment Debtor believes that during the first years it will be harder to sell El

---

[10] For a detailed description of the services provided by Key Management's, see **Exhibit N.**

Legado's residential properties than it will be to rent them.  Accordingly, while marketing efforts to sell the properties will commence immediately, the Reorganization Plan's financial projections reflect a very conservative and realistic appraisal of the approximate time that Consulting believes it will take to sell the full inventory of villas.  If the Plan is confirmed, Pendleton Associates LLC will provide consulting and services for El Legado's real estate sales and marketing program. Pendleton Associates is a prominent asset management and resort development firm with vast experience and a long track record of success in the marketing and sale of upscale properties throughout the Caribbean to both local and the stateside markets.  Headquartered in New York, its president, Mr. Brent Pendleton is in contact with the leading U.S. developers, marketing organizations, architects and planners, investment bankers, and legal firms who specialize in the acquisition and development of resort communities.  Consulting has held preliminary discussions with Mr. Pendleton and already received a preliminary proposal to provide said services to the reorganized entity once the Plan is confirmed. Pendleton Associates will outline the marketing plan, identify critical components of the local market as to second home and primary home opportunities as well as the most efficient and cost-effective means of reaching potential second home buyers.  A copy of Pendleton's Proposal attached hereto as **Exhibit K.**  On behalf of the Debtor it would also identify the alternatives for the staffing of the local sales organization as well as the opportunities for local and stateside broker participation, or even international sourcing.

In addition to the owners of residential villas that have been already sold to third parties, those that are subsequently sold subsequent to the confirmation of the Plan will also be invited to participate in the condo-hotel program. Participation in the condo-hotel

program will serve to enhance the value, and hence appeal of El Legado's residential villas as they will represent a much better investment for perspective buyers as well as provide the Resort with an additional source of income to meet its obligations.

The final pillar of the Plan is the establishment of a golf academy that will carry the Chi Chi Rodríguez name.  By offering additional products to those interested in assessing and improving their golf skills, The Chi Chi Rodríguez Golf Academy will serve as a highly marketable complement to the rental and condo hotel programs as well as to the villas themselves.  Rather than building separate facilities to house this academy – as the 2001 master plan proposed – Proponents believe the more appropriate and cost effective decision is that it make use of the existing – but under the Reorganization Plan remodeled – clubhouse facilities at least for the foreseeable future.

As Proponents envision it, the Chi Chi Rodríguez Golf Academy will offer a range of development programs to individuals and groups of all ages and skill levels. To further the promotion of the rental and condo-hotel programs, for example, the Resort will offer guests of both a variety of lodging and training packages.   As is the case with similar academies in the U.S., the specific components of each development program will depend on the specific attributes and development goals of El Legado's residents, visitors, and guests. In this way the Academy will be marketed to the various niches that exist within the golf tourism segment.

Multi-day programs will range from intensive three- to five-day courses aimed at more experienced golfers that shoot from the high 70s to the low 100s to one-, two-, and three-day programs for beginners the will focus on teaching the basics of the game.

These packages will be available for groups as well as individuals interested in more personalized one-on-one training.

In addition, the Academy will offer summer and winter-break junior camps for children and teenagers.  In contrast to the adult programs these will be primarily marketed to residents of El Legado and the surrounding area, although programs for children that accompany their parents during their stay at the Resort will also be available.  All development programs will offer constant, professional evaluation implemented by a high-quality staff that will be supervised by the most talented and successful golfer that Puerto Rico has ever produced.  As is true of every other component of a reorganized El Legado, Proponents believe that variety and flexibility to the needs of prospective guests is essential to the success of the Chi Chi Rodríguez Golf Academy.

These will aim to first, restore the material integrity, reputation, and marketability of the Resort; second, stabilize the Resort's finances so that it can once again meet its debt obligations; and third, establish the foundation of a middle- to long-term development plan.  It will accomplish this by placing the highest quality talent available in charge of the different components of the Plan and by establishing reasonable and feasible short-term goals.

As presented below, the Plan is informed by a sensible and thorough financial analysis that if approved will allow for El Legado to begin meeting its financial obligations within a reasonable time frame.  The full breakdown of the financial component of the Reorganization Plan including the Capital Structure; Construction Draw Schedule; Sources and Uses Schedule; Cash Flow Projections for the Rental

*El Legado Golf Resort (S.C.) S.E.*
Disclosure Statement

**Case No. 08-08231(BKT)**
Page 58 of 72

Program, Golf Course, Condo-Hotel and Sale of Villas, and Debt Repayment and Real Estate Absorption Schedule is presented are provided in Consulting's financial projections.

## VIII.   El Legado Financial Discussion

### 8.1   Capital Structure

The remodeling and repositioning of the new El Legado is projected to cost $10,614,804, with the following capital structure:

### USES OF FUNDS

| | | |
|---|---:|---:|
| HARD COSTS | $ 3,421,636 | 30.54% |
| FF&E, ITT, OS&E | $ 1,526,951 | 14.39% |
| SOFT COSTS | $ 2,269,840 | 21.38% |
| PAYMENTS TO SECURED CREDITORS | $ 752,109 | 7.09% |
| **SUBTOTAL BEFORE FINANCING COSTS AND** | | |
| **RESERVES** | **$ 7,970,536** | **75.09%** |
| RESERVES | $ 2,400,000 | 22.61% |
| FINANCING COSTS | $ 424,268 | 4.00% |
| **TOTAL PROJECT COST** | **$ 10,614,804** | **100.00%** |

### SOURCES OF FUNDS

| | | |
|---|---:|---:|
| **BANK LOANS** | | |
| SENIOR LOAN | $ 9,614,804 | 90.58% |
| **TOTAL DEBT** | **$ 9,614,804** | **90.58%** |
| **EQUITY** | | |
| | | —— |
| SPONSOR EQUITY | $ 1,000,000 | 9.42% |
| **TOTAL EQUITY** | **$ 1,000,000** | **9.42%** |
| **TOTAL SOURCES** | **$ 10,614,804** | **100.00%** |

## 8.2   Summary of Sources

As demonstrated above, the debt structure will consist of a senior loan to be financed by a financial institution which will provide financing for $9,614,804 or 90.58% of the Project's total construction cost.  The financial institution's credit facility will be originated as a non-revolving line of credit for construction purposes which will convert into a five year term loan upon completion of construction.

The Project's equity component totals $1,000,000, consisting of net proceeds generated from the sale of Tourism Law 78 of September 10, 1993 Investment Tax Credits.  Even though the face value of the Project's Investment Tax Credits is estimated to total $1,100,000 (50% of total funds invested by Mr. Rodriguez), the net proceeds amount assumed in the capital structure assumes that the selling cost and the discounted sale on the credits will result in a net sales profit of 85%. The net proceeds on tax credits will be invested in the Project upon the closing date of the hotel construction financing, and as such will be used to fund construction costs prior to loan disbursements.  In the event investment tax credits cannot be obtained, other equity funding sources both in the United States and in Puerto Rico have been identified.

## 8.3   Summary of Uses

The project's total hard costs of $3,241,636 consists of $2,621,293 to remodel El Legado's golf course.  These hard costs are based on preliminary estimates provided by Southworth Development based on an onsite inspection of the golf course in late November 2009.  The hard costs for the golf course mainly include the upgrade, purchase, and repair of maintenance equipment ($350,000), lake construction and

water storage enhancement ($300,000), the replacement of the course's existing bunker sand with bunker sand from Florida ($510,000), the construction of an outdoor cart storage building ($270,000), and upgrades to the maintenance facility, including gas and diesel storage tanks ($200,000).

The remodeling budget also includes $620,343 in hard costs for the completion costs of the project's existing villas, which is based on a construction estimate provided by DH Construction.  These hard costs mainly consist of landscaping ($150,000), pressure washing, plastering and painting ($85,000), tilework ($30,000), plumbing work ($25,000), and mechanical fixtures ($25,000).

An allowance for a guard house for the property ($150,000) was split evenly between the villas and golf course.  Additionally, the hard cost budget includes a contingency of 6% ($212,586) of total golf and villa hard costs, which mitigates the risk of any potential cost overruns. This contingency is conservatively split in half for both the golf and villa construction.

FF&E, ITT, and OS&E costs are estimated to total $1,526,951 or 14.72% of total construction cost.  This includes $646,951 in quality furniture for the villas such as beds, sofas, and tables as per a quotation form provided by Double Vision Hospitality Group. See **Exhibit M**.  Additionally, $420,000 in FF&E is required to purchase new televisions, laundry machines, air conditioning "mini split" units, and kitchen equipment for the Project's unfinished units.

Based on comparable projects, McConnell Valdes Consulting assumed that the villa's operating supplies and equipment (OS&E) would total $2,500 per room, resulting in a total OS&E budget of $190,000.  In addition, an allowance for information

technology (IT) totaling $120,000 was included in the construction budget, which accounts for the PMS system, Point of Sales equipment, WI-FI installation, and related computer software and hardware.

The budgeted soft costs for the project, which are estimated to total $2,269,840 or 21.38% of total project cost, include the fees for the project's accounting, marketing, legal fees, villa federal and state registrations, and working capital, among other costs to be incurred during pre-development and development of the Project.

The Project budget above includes $752,109 owed by El Legado, S.E to secured creditors.  These include payments to the CRIM, AEE, the Municipality of Guayama, and the State Insurance Fund, among others.

The Project budget includes $2,400,000 in debt service interest reserves to cover the interest on the $10,000,000 subordinated loan. This subordinated loan is the discounted value allocated to the existing loan owed to Westernbank, as explained below in further detail.  These reserves are so high due to the fact that El Legado is not projected to be able to repay the interest on the subordinated loan until the operation's fourth year of operations.

Please refer to the Sources and Uses Schedule contained as part of **Exhibit H**: the Construction Budget and Financial Projections for further detail of the project's construction costs.

An estimated market valuation of El Legado was prepared by McConnell Valdes Consulting[11] as of April 20, 2010, with a total estimated economic value of $12,643,450. This valuation assumes a value of $200,000 per villa considering the $63,200,000

---

[11] This market valuation was based on McConnell Valdes Consulting's general experience in the hotel industry. It was not prepared by a certified appraiser and was prepared solely for El Legado's Reorganization Plan.

market value as of May 1, 2005 for the original 316 villa project as per appraisal by McCloskey, Mulet, and Bonnin.  A 20% discount was applied to the net value of the unsold villa units to account for carrying costs assuming a 4 year sales absorption period.  The "As is" value of the land for the Hotel and land for additional residential lots was valued at $997,500.  Please refer to the attached **Exhibit E** for further detail regarding this valuation.

## IX.    FINANCIAL PROJECTIONS

The financial projections included below are based on the assumption that the New El Legado ("NewCo") would request financing to restore, upgrade and furnish the unfinished villa units, refurbish the Golf Course, and partially fund reserves for the operation of the Project, based on the following terms:

### 9.1   Senior Project Loan

- **Loan Type**        Interim construction Loan convertible into a term loan upon completion of construction.

- **Loan Amount**     $9,614,804

- **Commitment fee:**  1.00% of the principal amount of the loan.

- **Drawing Fee:**     0.25% of funds utilized for hard costs (including furniture and equipment).

- **Interest Rate**    During the first year of the term of the Project Loan, 90 day LIBOR[12] plus 325 basis points with a floor of 6.00% per annum.  Thereafter, based on the following grid:

---

[12] London Inter-Bank Offer Rate

| If the DSCR[13] is: | Adjusted Spread on 90 Day LIBOR |
|---|---|
| > 1.75x | 325 bps |
| Between 1.25x and 1.74x | 350 bps |
| Less 1.25x | 375 bps |

- **Term**            Five years after the Closing Date.

- **Repayment**       **Interim Loan (during construction):** Interest to be repaid by budgeted construction interest reserve. **Term Loan:** Monthly payments of interest, principal due in full at maturity.  Mandatory prepayments equal to: (i) 90% of Net Unit Sales Proceeds[14], and (ii) 90% of Net Parcel Sale Proceeds[15].

- **Collateral**      Senior lien on all assets of Borrower.

## 9.2   Restructuring and Subordination of Existing Loan

- **Loan Type**       Term Loan

- **Loan Amount**     $10,000,000

- **Interest Rate**   8.00%

- **Amortization**    Ten years after the Closing Date.

---

[13] Debt Service Coverage Ratio
[14] "Net Unit Sales Proceeds" means 90% of Gross Sales proceeds. "Gross Sales proceeds" means all proceeds received by Borrower from the sale of unfinished villa units.
[15] "Net Parcel Sales Proceeds" means 90% of Gross Sales Proceeds from the sale of the Hotel Parcel and of the future Residential parcel.

- **Repayment**                Monthly payments of interest, principal due in full at maturity.  Mandatory prepayment equal to: (i) 90% of Net Unit Sales Proceeds commencing with the closing of the sale of the first unfinished villa unit after the Project Loan is paid in full; (ii) annual payments of Excess Cash Flow after payment of Project Loan; and (iii) 90% of the Net Parcel Sale Proceeds if, at the time of the closing of the sale of the Hotel Parcel or of the Future Residential Parcel, as the case may be, the Project Loan has been paid in full.

Please refer to the Construction Draw and Repayment Schedule contained as part of **Exhibit H** for further detail regarding the hotel's projected uses of funds during construction.

### 9.3    Cash Flow and Debt Repayment Financial Projection Highlights

The following projections are based on financial projections internally prepared by McConnell Valdes Consulting.   The tables below are a summary of the main line items of the Construction Budget and Financial Projections included as attachments to this document.

| Description | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Combined NOI* | $417,899 | $296,215 | $  602,724 | $776,640 | $931,595 |
| Net Unit Sales Proceeds | $1,240,200 | $1,240,200 | $2,728,440 | $3,224,520 | $3,472,560 |
| Net Parcel Sales Proceeds | 0 | 0 | $1,800,000 | 0 | $2,592,000 |
| Senior Debt Service | $543,449 | $478,265 | $301,634 | $78,374 | |
| Senior DSCR | 3.05x | 3.21x | 17.01x | 51.05x | |
| Outstanding Senior Debt ** | $8,670,306 | $8,018,664 | $4,547,269 | $1,734,863 | $0 |

*El Legado Golf Resort (S.C.) S.E.*　　　　　　　　　**Case No. 08-08231(BKT)**
Disclosure Statement　　　　　　　　　　　　　　　　　　　Page 65 of 72

| Outstanding Subordinated Debt** | $9,585,475 | $9,201,371 | $8,631,912 | $8,309,269 | $3,575,410 |
|---|---|---|---|---|---|

*This includes combined net operating income for the Rental Program and the Golf Course Operation.

**At End of Year, following repayment of principal.

The project's Net Operating Income (NOI) reflected above includes the rental program's net operating income as well as the net operating income generated by El Legado's golf course operation.   The Project's combined NOI is sufficient to cover the senior loan throughout the entire projection horizon, as demonstrated by the debt service coverage ratio of 3.05x in year 1 and 3.21x in year 2.   The hotel's DSC ratio improves significantly in year 3 to 17.01x as a result of the $1.8 million net parcel sale of the Hotel land parcel.  This net parcel sales price assumes that the property would have been properly entitled for 100 units.

Additionally, a full repayment of the senior loan is expected to occur during year 4 while the subordinated loan is expected to occur by year 5 of operations.   Even though the excess cash flow from combined net operating income and net unit sales proceeds is not sufficient to cover the subordinated loan's interest expense, the Project budget includes an ample $2,400,000 subordinated interest reserve precisely to cover these projected interest expense shortfalls.

Once both the senior and subordinated debt has been fully repaid, Mr. Rodriguez's $1,000,000 equity investment in the Project shall receive a 12% preferred return over the outstanding principal balance on said investment.   These interest payments will accrue in years where there is insufficient excess cash flow ("ECF") to repay this interest.  Once all accrued interest and the total $1,000,000 principal balance owed to Mr. Rodriguez has been repaid from excess cash flow,   the ECF shall be split

as follows: 90% to Mr. Rodriguez and 10% to the unsecured creditors until the unsecured creditors receive $250,000. The unsecured creditors are projected to receive this $250,000 by the Project's seventh year of operations.

<u>DISCLAIMER</u>:  THIS ANALYSIS DOES NOT TAKE INTO ACCOUNT NOR MAKE PROVISION FOR ANY POSSIBLE RISE OR DECLINE IN LOCAL OR GENERAL ECONOMIC CONDITIONS.   THE PROJECTIONS HAVE BEEN PREPARED BASED ON INFORMATION MADE AVAILABLE TO MCCONNELL VALDES CONSULTING, INC AND MCCONNELL VALDES CONSULTING, INC'S EXPERIENCE IN THIS INDUSTRY. HOWEVER, NEITHER MCCONNELL VALDES CONSULTING, INC NOR ANY OF ITS AFFILIATED OR SUBSIDIARY COMPANIES WARRANTS, GUARANTEES, NOR MAKES ANY REPRESENTATION WITH REPSECT TO ANY OF THE PROJECTIONS SET FORTH IN THIS ANALYSIS. PROJECTIONS ARE SUBJECTO TO UNCERTAINTY AND VARIATION AND THEROFRE ARE NOT REPRESENTED AS RESULTS THAT WILL BE ACTUALLY ACHIEVED.  THESE PROJECTIONS ARE FOR INORMATION ONLY AND ARE NOT INTENDED AS INDUCEMENT FOR ACTION OR INVESTMENT.   THERE IS NO OBLIGATION TO REVISE OR UPDATE THE PROJECTIONS TO REFLECT SUBSEQUENT CHANGES IN THE INFORMATION OR ASSUMPTIONS ON WHICH THEY WERE MADE.  NEITHER MCCONNELL VALDES CONSULTING, INC'S NAME NOR THIS ANALYSIS MAY BE REPRODUCED IN WHOLE OR IN PART OR INCLUDED IN ANY PROSPECTUS, NEWSPAPER, PUBLICITY, OR AS PART OF ANY PRINTED MATERIAL OR PART OF ANY OTHER STUDY OR REPORT OR USED IN OFFERINGS OR REPRESENTATIONS IN CONNECTION WITH THE SALE

OF REAL ESTATE, SECURITIES, MEMBERSHIPS, OR PARTICIPATION INTERESTS

TO THE PUBLIC UNLESS SUCH USE IS CONSENTED TO IN WRITING BY

MCCONNELL VALDES CONSULTING, INC.

## X.      DETERMINATION OF CLAIMS

The Plan specifies procedures for estimating disputed claims and objecting to

claims.  Debtor and any other entity authorized under the Bankruptcy Code may object

to Claims within thirty (30) days before the first date fixed by the Bankruptcy Court for

the hearing of the Plan. No payments will be made under the Plan on account of

Disputed Claims until their allowance by the Bankruptcy Court. The Plan provides that

Distributions on Disputed Claims will be held in reserve by the Trustee until the

Disputed Claims are allowed (at which time the reserves will be distributed and the

Claims will be treated according to the terms of the Plan), or disallowed (at which time

the reserves will be distributed on account of Allowed Claims pursuant to the terms of

the Plan).   Any Claims which (a) are not listed as an Allowed Claim on Debtor's

Schedules, as amended; (b) are not evidenced by a valid, timely filed Proof of Claims or

(c) are not listed in the Plan or exhibits to the Plan as an Allowed Claim, shall not

receive any distribution of cash or property under the Plan until the same becomes an

Allowed Claim, and shall be disallowed and discharged if the Claims are not Allowed by

Order of the Bankruptcy Court.

## XI.      LIQUIDATION ANALYSIS / BEST INTERESTS TEST

Bankruptcy Code section 1129(a)(7) requires that each holder of a Claim or

Interest in an impaired Class either (i) vote to accept the Plan, or (ii) receive or retain

under the Plan cash or  property of a value, as of the effective date of the Plan, that is

not less than the value such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. This is commonly referred to as the "Best Interests Test."

In a Chapter 7 case, a trustee or trustees would be elected or appointed to liquidate the debtor's assets and make distributions to creditors in accordance with the priorities set forth in the Bankruptcy Code. Secured creditors generally are paid from the proceeds of sale of the properties securing their liens. If any assets are remaining after the satisfaction of secured claims, administrative expenses generally are next to receive payments. Unsecured claims are paid from any remaining sales proceeds or other estate assets, according to their rights to priority.

Unsecured claims with the same right to priority receive a pro rata distribution based on the amount of their allowed claim in relation to the total amount of allowed unsecured claims with the same right to priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid. Thus, for the Court to confirm the Plan, the Court must find that all creditors and shareholders in impaired Classes who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a hypothetical Chapter 7 liquidation.

The Proponents, together with Consulting prepared the liquidation analysis, attached hereto as **Exhibit L**, reflecting the estimated cash proceeds, net of liquidation-related costs, that would be realized if each Debtor were liquidated in accordance with Chapter 7 of the Bankruptcy Code.

The Liquidation Analysis is based on the estimated book values as of March 31, 2009, adjusted for post-petition financial claims as of the date of the Chapter 11 filing.

For purpose of determining a liquidation value, the schedule value of the real property, has been determined at market value pursuant to the estimated real market value as of April 20, 2010. See **Exhibit E.**

Considering estimated realizable value for the assets, less the estimated administrative expenses and liens and encumbrances to determine the estimated amount for unsecured creditors in a liquidation, this analysis shows that, upon realization of estate assets and payment of liens and expenses, unsecured creditors would receive a 0% dividend under a Chapter 7 proceeding. The liquidation analysis projects the proceeds of the assets of the estate that would go solely to satisfy the Super-priority Senior Lien and part of Westernbank's Secured Claim. Accordingly, all holders of Priority Claims, General Unsecured Claims and Interests in the case would receive no distribution in the event that the Debtor is liquidated under Chapter 7 of the Bankruptcy Code.

The Proponents believe that liquidation of the Debtor under Chapter 7 would result in: (a) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee; (b) additional expenses and claims, some of which would be entitled to priority in connection with a cessation of the Debtor's operations; and (c) the failure to realize the greater, going concern value of the Debtor's assets.

THE LIQUIDATION ANALYSIS, INCLUDING THE CLAIMS ESTIMATES, WAS PREPARED SOLELY TO ASSIST THE BANKRUPTCY COURT IN MAKING THE

FINDINGS REQUIRED UNDER SECTION 1129(a)(7) OF THE BANKRUPTCY CODE AND MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

PROPONENTS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR OR A CHAPTER 7 TRUSTEE. NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS REPRESENTED IN THE LIQUIDATION ANALYSIS.

## XII.   FEASABILITY OF THE PLAN

Proponents, with the assistance of Consulting, have prepared financial projections (the "Projections") based on the confirmation and implementation of the Plan. The Projections are based upon estimates and assumptions that, although developed and considered reasonable by the Proponents are inherently subject to significant economic uncertainties and contingencies beyond its control, as well as to certain assumptions with regard to the value of assets that are subject to change. Accordingly, there can be no assurance that the projected performance reflected in the Projections will be realized. See **Exhibit H**.

## XIII.   <u>ALTERNATIVES TO THE PLAN</u>

If the Plan is not confirmed and consummated, the alternatives include: (a) Debtor's liquidation under Chapter 7 of the Bankruptcy Code, (b) dismissal of the case or (c) the proposal of an alternative plan.

If no plan can be confirmed, the case may be converted to Chapter 7 of the Bankruptcy Code, and as indicated above, a Chapter 7 trustee would be elected or appointed to liquidate Debtor's assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. Dismissal of the Case would likely create substantial problems for all parties involved therein including, a run to the courthouse, and the foreclosure by Westernbank of its mortgage, which would result, in an abandonment of the orderly and structured equitable payments and the elimination of the aforesaid $1,000,000.00 contribution provided under the Plan under the provisions of the Bankruptcy Code. Therefore, dismissal of the case is not a viable alternative for creditors. Thus, Proponents believe that the interest of Creditors and the goals of Chapter 11 are better served by the continuation of the Chapter 11 proceedings.

## XIV.   <u>EFFECT OF CONFIRMATION</u>

The provisions the Plan, if confirmed, shall bind the Debtor, all Creditors, Interest holders, and any entity acquiring property under the Plan, whether or not the Claim or Interest of such Creditor, Interest holder, or entity is impaired under the Plan and whether or not such Creditor, Interest holder, or entity has accepted the Plan.

*El Legado Golf Resort (S.C.) S.E.*
Disclosure Statement

Case No. 08-08231(BKT)
Page 72 of 72

## XV.  RECOMMENDATION

Proponents also believe that the Plan is fair and reasonable, in the best interest of the Estate and Creditors, and offers the best possible recoveries for Creditors. Debtor and Mr. Rodríguez therefore, urge Creditors to vote in favor of the Plan.

Respectfully submitted.

In San Juan, Puerto Rico this 10th day of March, 2010.

**EL LEGADO GOLF RESORT (S.C.) S.E.**       **Mr. JUAN A.RODRÍGUEZ VILÁ**

By _____
Juan A. Rodríguez Vilá
Principal Shareholder

By _____
Juan A. Rodríguez Vilá


GERENA LAW OFFICE
Attorney for Debtor
PO BOX 195542
San Juan, P.R. 00919-5548
Tel: (787)766-0780
Fax: (787)766-0780
jlgere@gmail.com

McCONNELL VALDES LLC
Attorneys
for Juan A. Rodríguez Vilá
270 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Telephone: (787) 250-5604/5681
Fax: (787) 759-2771/2783
aaa@mcvpr.com
ycp@mcvpr.com


By: s/Jorge L. Gerena Mendez
Jorge L. Gerena Mendez
USDC PR No. 211701

By: s/Antonio A. Arias-Larcada
Antonio A. Arias-Larcada
USDC PR No. 204906

By: s/ Yarilyn C. Pérez-Colón
Yarilyn C. Pérez-Colón
USDC PR No. 224514


Dated: May 10th, 2010