# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF PUERTO RICO

| |
|---|
| IN RE:<br><br>EL LEGADO DE CHI CHI RODRÍGUEZ GOLF RESORT, S.C., S.E.<br><br>Debtor |

CASE NO. 08-08321(BKT)

CHAPTER 11

## OBJECTION TO DISCLOSURE STATEMENT AND JOINT PLAN OF REORGANIZATION FILED BY DEBTOR AND JUAN A. RODRÍGUEZ VILÁ (DOCKETS NO. 313 AND 314)

TO THE HONORABLE COURT:

COMES NOW BANCO POPULAR DE PUERTO RICO (hereinafter "BPPR"), through the undersigned legal representation, and very respectfully STATES and PRAYS:

### I. Introduction

1) On May 10, 2010, Debtor and Mr. Juan A. Rodríguez Vilá (hereinafter, "Rodríguez") filed a joint Disclosure Statement (docket #313) and Joint Plan of Reorganization (docket #314) (hereinafter, the "Joint Plan").

2) For the reasons stated below, BPPR hereby objects to the approval of the Disclosure Statement, since it omits important

information, and therefore does not comply with the "adequate information" standard of 11 U.S.C. §1125.

3) BPPR further objects to the approval of Disclosure Statement as the Joint Plan is unconfirmable on its face pursuant to 11 U.S.C. §1129.

## II. Issues Regarding the Disclosure Statement

4) Section 1125(b) of the Bankruptcy Code requires that a Disclosure Statement be filed and approved as containing "adequate information" before votes for or against a reorganization plan can be solicited. 11 U.S.C. §1125(b).

5) For the purposes of section 1125, "adequate information" means

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan 11 U.S.C. §1125(a)(1).

6) When determining whether the information provided in the disclosure statement is adequate, Norton states:

> In adopting the "adequate information" standard, Congress provided the bankruptcy

court with the ability to adopt a practical
approach in evaluating the nature and
substance of information provided. Under
this standard, bankruptcy courts are able to
evaluate the adequacy of the information
provided in light of the circumstances in
each case, including costs of preparation of
the statements and the solicitation, the
need for a quick solicitation and
confirmation, and the identity of the
investors. 4 William L. Norton, Jr., <u>Norton
Bankr. L. & Practice 2d</u>, §86.22 (2005).

7) The determination of what constitutes 'adequate information'

is made on a "case-by-case basis" and should be evaluated "in

light of the particular circumstances of the case". See <u>In

re: El Comandante Management Company, LLC</u>, 359 B.R. 410, 414

(Bankr. PR, 2006).

8) Whether or not information provided in the disclosure

statement is adequate will be determined by the Bankruptcy

Code and "is not governed by any otherwise applicable

nonbankruptcy law, rule, or regulation…". <u>In re Public

Service Company of New Hampshire</u>, 43 F.3d 763, 766 (1st Cir.,

1995); <u>In re: El Comandante Management Company, LLC</u>, Bankr.

Ct. D.P.R., Case No. 04-10938(ESL), docket #945.

9) The Disclosure Statement is missing important information that

is essential to a creditor's evaluation of the Joint Plan,

therefore making it impossible for a creditor to determine

whether it will vote for or against the plan.

## A. **The Financing**

10) The Joint Plan depends wholly on a financing that is yet to be obtained. Debtor and Rodríguez requested a time period of 90 days from the filing of the Disclosure Statement and Joint Plan to obtain this financing. This period expires on August 8, 2010.

11) Creditors have no information regarding this financing and, as such, cannot be expected to vote for or against the Joint Plan at this point in time for the following reasons:

a) The financing is uncertain at this point;

b) The terms for the loan in the Joint Plan are merely proposed terms and there is no guarantee that a financial institution will accept them;

c) Any changes in the financing would trickle down and affect the payment to classes in ways that are not disclosed;

d) BPPR is particularly affected since Debtor's proposal is to cancel BPPR's collateral in order to obtain the financing, and requires all relevant information thereof.

12) Without the information regarding the financing and its terms in place, creditors cannot be expected to be able to

evaluate whether they will vote for or against the Joint Plan and, therefore, the Disclosure Statement cannot be approved.

13)   The financing is further discussed below.

**B. <u>The Effective Date</u>**

14)   The manner in which the Effective Date of the Joint Plan is to happen is too indeterminate.

15)   Section 9.1 of the Joint Plan, states that the following conditions must be met before the Effective Date occurs and, therefore, creditors begin to receive payments under the plan:

a) The Confirmation Order, in form and substance reasonably acceptable to Debtor, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

b) Each of the Plan Documents[1], in form and substance reasonably acceptable to Debtor; (i) shall have been executed, delivered and, if necessary, properly recorded; (ii) shall have become effective; and (iii) shall have been filed with the Bankruptcy Court;

c) All actions, other documents and agreements necessary to implement the Plan shall have been executed, delivered and,

---

[1] According to the plan definitions, "Plan Documents" shall mean and include such agreements, instruments and documents as may be required to effectuate the terms of this Plan. <u>Joint Plan</u>, page 13.

if necessary, properly recorded, and shall have become effective; and

d) Debtor shall obtain from a Financial Institution a post-petition financing of not less than $9,614,804 for the completion of residential villas, refurbish of the Golf Course, and partially fund reserves for the operation of the Reorganized Debtor; and

e) The Estate shall have sufficient Cash to meet all Cash funding obligations under the Plan required to be made on the Effective Date, including without limitation, sufficient Cash to establish the Disputed Claims Reserve as to this claims to be paid by Debtor.

16) Given the conditions required by Debtor for the Effective Date to occur, creditors have no way of knowing when or even **if** the Plan may actually come into effect and when payments will actually begin.

17) Conditions (a) and (b) do not explain what precisely needs to happen for the Confirmation Order and Plan Documents to be deemed "reasonably acceptable to the Debtor".

18) Conditions (b), (c) and (e), could be held up indefinitely or could even never happen and, since the Plan does not propose a maximum amount of time for these conditions to take place, there is a possibility the case could stay in a limbo

of indeterminable length with creditors who receive no money while there is a reorganized, discharged debtor who has paid no one.

19) Although condition (e) requires "sufficient Cash to establish the Disputed Claims Reserve", neither the Disclosure Statement nor the Joint Plan define or explain what is the "Disputed Claims Reserve". This term hast to be clearly defined and the amount needed to fund this reserve must be disclosed.

20) As described by Benjamin Weintraub and Michael J. Crames, the effective date is:

> (...) the date upon which a confirmed plan becomes operative and distribution of cash or property is commenced. In essence, it is the point in time when the plan can and should be susceptible of implementation and commencement of the operations of its provisions. **The date is important to claimants and interest holders because of the distribution to them of value whether it is money or other property**. Weintraub & Crames, "Defining Consummation, Effective Date of Plan of Reorganization and Retention of Post confirmation Jurisdiction: Suggested Amendments to Bankruptcy Code and Bankruptcy Rules", 64 Am. Bankr. L.J. 245, 276 (1990). (Our emphasis).

21) "Effective date for the plan of reorganization should be precisely defined in order to remove all uncertainty as to the date the plan becomes operative so that the value of the

property to be distributed under the plan becomes certain. **The effective date plays an important role in valuation and should therefore be set forth in the plan with specificity**." In re: Potomac Iron Works, Inc., 217 B.R. 170, 172-173 (B.Ct. MD, 1997). (Our emphasis).

22) This missing information is essential as it could hold up the Effective Date and creditors do not know with a certainty when payments would begin. The Effective Date affects the valuation of both property and claims and should be clearly defined.

C. **Valuation of the Property**

23) The Joint Plan includes a valuation of the property for $12,643,450.00. See Joint Plan, Exhibit E (docket #314-1) (hereinafter, the "Valuation").

24) The Valuation assigns value to the villas and the land for the hotel and Phase II residential units.

25) It is unclear from this valuation what value, if any, is given to the golf course.

26) This is important information given that the golf course is the centerpiece of the El Legado development.

27) The golf course is part of BPPR's collateral and it is essential to know whether it was taken into consideration.

D. **Equity Component**

28)  According to the Disclosure Statement, the project's equity
     component will consist of the net proceeds generated from the
     sale of Tourism Law 78 of September 10, 1993 Investment Tax
     Credits by Rodríguez.  The net proceeds from this sale will be
     used in the Project upon the closing date of the hotel
     construction financing, and will be used to fund construction
     costs prior to loan disbursements.  In the event the
     investment tax credits cannot be obtained, the Disclosure
     Statement states that other equity funding sources both in the
     United States and Puerto Rico have been identified.  (See
     Disclosure Statement, page 59).

29)  Given the importance of this "equity component", far more
     information and in greater detail is required regarding these
     tax credits, what is necessary in order to obtain them,
     whether they belong to Rodríguez Vilá personally or to Debtor,
     what agencies need to approve them, how long this process
     would take, and when this money would enter the estate.

30)  The additional "equity funding sources" that have already
     been identified must be disclosed to creditors, so that they
     may ascertain the risk involved in voting for the Joint Plan.

31) The information regarding the equity component of the financing must be crystal clear and the issue of the timing of the sale of these tax credits is essential. The previously existing shares are to be cancelled on the Effective Date and Rodríguez will receive 100% of the shares in the reorganized Debtor (NewCo) in exchange for his new value contribution.

32) If the shares are transferred before the capital infusion is made, Rodríguez will be getting a reorganized debtor, with discharged debts, for nothing.

33) More information must also be supplied as to what powers Rodríguez will have in the Reorganized Debtor. The Disclosure Statement states that he will retain the power of naming of members the Board of Directors, but mentions nothing else specifically. The current situation in which Debtor finds itself was caused by mismanagement (see Disclosure Statement, pages 17-18).

34) The management powers of Rodríguez are a cause of concern for BPPR as there is no point in reorganizing this Debtor only to have it fall into the same patterns again.

35) The equity component will be further discussed below.

**E. Closing Date**

36) The term "closing date" is not defined in the Disclosure Statement or Joint Plan. The treatment to classes 2 and 3 (Disclosure Statement, page 37), calculates the payment period for these classes as 10 years and 7 years after the closing date, respectively.

37) This date must be clearly defined in the Disclosure Statement.

**III. Issues Regarding the Plan of Reorganization**

38) The Court may pass upon confirmation issues at the hearing of a disclosure statement where, as here, the plan is so fatally flawed that confirmation is impossible. <u>In re Bjolmes Realty Trust</u>, 134 B.R. 1000, 1002 (Bankr. Mass., 1991). See also: <u>In re Mahoney Hawkes, LLP</u>, 289 B.R. 285, 294 (Bankr. D. Mass., 2002) ("While these are issues for the hearing on confirmation, I find it appropriate to rule upon them now. (…) "it is permissible … for the court to pass upon confirmation issues where, as here, it is contended that the plan is so fatally and obviously flawed that confirmation is impossible." (Citations omitted)"); <u>In re O'Leary</u>, 183 B.R. 338, 338-339 (Bankr. D. Mass., 1995) ("Court may refuse to approve disclosure statements that describe plans that cannot

be confirmed."); El Comandante, *supra*, at 415. ("At the hearing on the approval of a disclosure statement, the court may consider issues pertaining to the plan, and may rule upon such issues, when the plan defects will make it unconfirmable (citations omitted), that is, when the "plan is so fatally, and obviously flawed that confirmation is impossible" (citations omitted).").

39) If the plan is unconfirmable, "it is now well accepted that a court may disapprove of a disclosure statement, **even if it provides adequate information about a proposed plan**, if the plan could not possibly be confirmed." In re CRIIMI MAE, Inc., 251 B.R. 796, 799 (Bankr. D. Md., 2000) (our emphasis). See also El Comandante, *supra*, at 415. ("The court may disapprove a disclosure statement that contains adequate information, when the proposed plan cannot possibly be confirmed.")

40) In order to be confirmed, the Joint Plan must comply with the requirements of §1129.

41) The Joint Plan includes fatal flaws that render it unconfirmable and, therefore, the Disclosure Statement should not be approved.

A. **The Joint Plan Is Not Fair and Equitable**

       **i. BPPR's Secured Claim**

42) The Joint Plan divides BPPR's claim into a secured and
unsecured portion. The secured portion of BPPR's claim is
dealt with as Class 2, "Westernbank's Secured Claim".

43) The holder of a Class 2 claim will receive on its claim
regular installment payments in cash of a total value, as of
the Effective Date of the Plan, equal to the allowed amount of
such claims over a period ending no later than ten years after
the closing date, including interest of 8% per annum. Class 2
is listed as having an allowed claim of $10 million.

44) For a plan to be fair and equitable regarding a secured
claim, Section §1129(b)(2)(A) requires that the plan comply
with one of three standards:

> (i)(I) that the holders of such claims
> retain the liens securing such claims,
> whether the property subject to such liens
> is retained by the debtor or transferred to
> another entity, to the extent of the allowed
> amount of such claims; and

> (II) that each holder of a claim of such
> class receive on account of such claim
> deferred cash payments totaling at least the
> allowed amount of such claim, of a value, as
> of the effective date of the plan, of at

least the value of such holder's interest in
the estate's interest in such property;

(ii) for the sale, subject to section 363(k)
of this title, of any property that is
subject to the liens securing such claims,
free and clear of such liens to attach to
the proceeds of such sale, and the treatment
of such liens on proceeds under clause (i)
or (iii) of this subparagraph; or

(iii) for the realization by such holders of
the indubitable equivalent of such claims.

45) The Joint Plan does not comply with any of these
provisions.

46) The Joint Plan provides for the cancellation of all liens
on the Effective Date (Joint Plan, page 37). It does not
provide for BPPR to retain its collateral and will provide
Class 1 with a superpriority lien over all assets of the
Debtor (Joint Plan, page 22). Therefore, although BPPR will
receive cash payments, it will not retain its lien as required
by section 11 U.S.C. §1129(b)(2)(A)(i).

47) BPPR is also not receiving cash payments equal to the
present value of the allowed amount of its claim.

48) A secured creditor has an allowed claim up to the value of
its collateral. 11 U.S.C. §506.

49) The Joint Plan provides a valuation for purposes of the
plan, giving a total market value to the property of

$12,643,450.00. Although BPPR disputes this amount, it will accept it for discussion purposes[2].

50) BPPR holds liens over all of Debtor's property. This means that, pursuant to §506, BPPR's allowed secured claim is for the $12,643,450.00 that Debtor valued the project. Despite this fact, the Joint Plan proposes a payment of only $10 million, $2,643,450.00 less than the admitted value of the property. "(…), the value of the secured portion of an undersecured creditor's total claim is by *definition* equal to the value of the collateral securing it." <u>In re: Arnold & Baker Farms</u>, 85 F.3d 1415, 1423 (9th Cir., 1996).

51) Since BPPR is not receiving cash payments equal to the present value of the allowed amount, the Joint Plan again fails to comply with 11 U.S.C. §1129(B)(2)(A)(i).

52) The Joint Plan also does not propose for BPPR's lien to attach to proceeds of sale, also failing to comply with 11 U.S.C. §1129(B)(2)(A)(ii).

53) Finally, BPPR is not receiving the "indubitable equivalent" of its secured claim. ""Indubitable" means too evident to be doubted." <u>Arnold</u>, *supra*, at 1421.

---

[2] Pursuant to FRBP 3001(f), the filed Proof of Claim constitutes *prima fascie* evidence of a claim unless objected. No objection to BPPR's claims has been filed and, therefore, the allowed amount of the claim is for $26,761,353.64.

54) Pursuant to Collier:

> The phrase "indubitable equivalent" is a term of art. It means, in essence, that the treatment afforded the secured creditor must be adequate to both compensate the secured creditor for the value of its secured claim, **and also insure the integrity of the creditor's collateral position.**" <u>Collier On Bankruptcy 15th Ed.</u>, P. 506.03. (Our emphasis).

55) Given the proposed cancellation of its liens, in the event of a default BPPR would be left as an unsecured creditor and, therefore, in a worse position than before the Joint Plan.

56) When credit was extended, Westernbank/BBPR bargained on the right to foreclose on its collateral in order to satisfy the outstanding obligation. Since the Joint Plan is cancelling BPPR's liens, it [BPPR] will be forced to assume the risk of receiving less without being able to look to the collateral for security. "To the extent a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure." <u>Arnold</u>, *supra*, at 1422.

57) "If altering the collateral would place the secured creditor in a worse off collateral position (…), then the plan would fail to provide the secured creditor with the

"indubitable equivalent" of its claim.  That is because the plan would fail to protect the creditor's collateral position during the repayment period."  <u>Collier On Bankruptcy 15th Ed.,</u> P.506.03.

58)  The statutory requirements of §1129(b)(2)(A)(i-iii) are minimum requirements.

> As a number of courts have recognized, the fair and equitable standard embodies a number of implicit requirements, including the requirement that the plan not unfairly shift risk to the secured creditor.  In order to maintain the secured creditor's relative balance of risk, the secured creditor cannot, among other things, be put in a worse off position from a collateral perspective.  <u>Collier On Bankruptcy 15th Ed.,</u> P.506.03.

59)  Given that BPPR is receiving less than the value of its secured claim, and its collateral position is being erased, the Joint Plan is not fair and equitable regarding Class 2.

### ii. BPPR's unsecured claim

60)  The unsecured portion of BPPR's claim is dealt with as part of Class 3 General Unsecured Claims.

61)  Each holder of a Class 3 claim will receive on its claim its Pro Rata Share of the Allowed Claim ($250,000.00) at year seven after the closing date.  (See Joint Plan, page 27).

62)  For a plan to be fair and equitable regarding a class of

unsecured claims, Section §1129(b)(2)(B) requires:

>(i) that the plan provide that each holder
>of any claim of such claim property of a
>value, as of the effective date of the plan,
>equal to the allowed amount of such claim;
>or
>
>(ii) the holder of any claim or interest
>that is junior to the claims of such class
>will not receive or retain under the plan on
>account of such junior claim or interest any
>property (…).

63)  The unsecured creditors must be paid in full or all classes

junior to the dissenting class must be eliminated.  This is

known as the absolute priority rule.

64)  Class 5, the Equity Security Holders (Mr. Juan Rodríguez

Vilá, Potrero Matos, Inc., and T-MG, Inc.), will receive no

distribution, retain no rights or property and their shares

will be cancelled.  (See Joint Plan, page 29).

65)  However, on the Effective Date new stock for the

Reorganized Debtor will be distributed exclusively to

Rodríguez Vilá in exchange for the monies to be obtained from

the sale of certain tax credits (previously discussed in

section II.D.) at an indeterminate time.  Rodríguez will

retain and increase his interest in the property on account of

his junior claim.

66) This violates the absolute priority rule.

67) The absolute priority rule may have an exception in the corollary of new value. It provides that the objection of an impaired senior class does not bar junior claim holders from receiving or retaining property interests in the debtor after reorganization, if they contribute new capital in money or money's worth, reasonably equivalent to the property's value, and necessary for successful reorganization of the restructured enterprise. See: <u>Bank of America National Trust and Savings Association v. 203 North Lasalle Street Partnership</u>, 526 U.S. 434, 442 (1999).

68) The capital contribution on it's face does not meet the requirements that allow junior claim holders to receive or retain property interests in the debtor after reorganization.

69) First, it is impossible to determine whether the contribution to be made is reasonably equivalent to the property's value.

70) Since the sale of the tax credits is yet to take place, the actual amount that Rodríguez will receive and contribute is indeterminate. Although the Joint Plan projects an 85% recovery of the total amount, that is by no means a certainty and **makes valuation of this capital infusion impossible**.

71) Second, for the Effective Date to occur, it is not required for the capital infusion to have been made. This makes it a very real possibility that at the time the shares are transferred the estate will have received nothing in exchange.

72) Third, Rodríguez is being reimbursed his capital infusion with interest before payment to the Class 3 unsecured creditors is made. (Disclosure Statement, page 65)[3]. This means that again he is receiving property before senior claimants are paid in full.

73) Not only is Rodríguez obtaining new stock on account of his junior claim, but he will receive and he will be reimbursed his contribution before payment to all creditors is made and his contribution does not meet the burden to qualify for the new value exception, if applied to this case this preferential treatment violates the absolute priority rule.

## B. The §364 financing

---

[3] "Once both the senior and subordinated debt has been fully repaid, Mr. Rodríguez's $1,000,000 equity investment in the Project shall receive a 12% preferred return over the outstanding principal balance on said investment. These interest payments will accrue in years where there is insufficient excess cash flow ("ECF") to repay this interest. Once all accrued interest and the total $1,000,000 principal balance owed to Mr. Rodríguez has been repaid from excess cash flow, the ECF shall be split as follows: 90% to Mr. Rodríguez and 10% to the unsecured creditors until the unsecured creditors receive $250,000. The unsecured creditors are projected to receive this $250,000 by the Project's seventh year of operations." (Disclosure Statement, pages 65-66).

74) In order to obtain financing, the Joint Plan is proposing a superpriority lien over all of Debtor's assets. (Joint Plan, page 22).

75) In order to obtain credit secured by a senior lien on property that is subject to a lien, the Bankruptcy Code requires for Debtor to comply with the following:

> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior lien on property of the estate that is subject to a lien only if -
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

76) Debtor must first try to obtain credit without this superpriority lien. No evidence has been presented that these actions have been taken.

77) Even if Debtor can prove that it is impossible to obtain credit any other way, BPPR is not being offered adequate protection on its lien.

78) Adequate protection is usually provided by "conditioning or limiting the borrowing in order to maintain a sufficient

equity in the subject property to protect the existing lienholder." <u>Collier On Bankruptcy, 15th Ed.</u>, P.364.05.

79) The Joint Plan is not offering any replacement liens to BPPR, and is actually stripping it of it existing liens.

80) As stated by Collier:

> Where the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied. **The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the existing lender in order to provide additional protection for a new, postpetition lender**. <u>Collier On Bankruptcy, 15th Ed.</u>, P.364.05. (Our emphasis).

## C. <u>Unfair discrimination</u>

81) The Joint Plan unfairly discriminates in the classification of the unsecured creditors by separating classes 3 and 4. Both class 3 and 4 are general unsecured creditors and have no legal reason for being separated into different classes.

82) 11 U.S.C. §1122 states that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.

83) Courts in the First Circuit have held that **substantially similar creditors must be placed in the same class**. See <u>In re National/Northway Limited Partnership</u>, 279 B.R. 17, 25 (Bankr. D. Mass., 2002). This is a stricter test than in other circuits.

> The general rule regarding classification is that **"all creditors of equal rank with claims against the same property should be placed in the same class."** (Citations omitted). Separate classifications for unsecured creditors are only justified "where the legal character of their claim is such as to accord them a status different from the other unsecured creditors." (Citations omitted). <u>Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund</u>, 748 F.2d 42, 46 (1st Cir., 1984). (Our emphasis).

84) Pursuant to the Joint Plan, BPPR holds a deficiency claim of $16,761,353.64. This represents 87.22% of class 3. This means that BPPR's vote against the plan in this class would determine that class rejected the plan. With class 2 vote to reject, and class 5 presumptive vote to reject, the approval of the Joint Plan depends wholly on the acceptance of class 4 (for which no distribution is proposed).

85) If the three creditors in class 4 had been included with the rest of the unsecured creditors in class 3, BPPR would

have held 62.25% of the class, enough to preclude acceptance by that class.

86) The Joint Plan therefore needed an impaired class that did not contain BPPR, and the debtor has therefore artificially classified the members of class 4 in order to have the possibility of an impaired class vote for the plan.

87) The circuit courts are practically unanimous in that "similar claims may not be separately classified solely to engineer an assenting impaired class". In re Boston Post Road Limited Partnership, 21 F. 3d 477, 482 (2nd Cir., 1994). See Greystone III, 995 F.2d 1274, 1279 (5th Cir., 1991) ("If §1122(a) permits classification of "Substantially similar" claims in different classes, such classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims."); Travelers Ins. Co. v. Bryson Properties, XVIII, 961 F.2d 496, 502 (4th Cir., 1992) ("Although separate classification of similar claims may not be prohibited, it "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired assenting class of claims."); Olympia & York Florida Equity Corp. v. Bank of New York, 913 F.2d 873, 880 (11th Cir., 1990) ("If the classifications are designed to manipulate class

voting…, the plan cannot be confirmed."); <u>Hanson v. First Bank of South Dakota, N.A.</u>, 828 F.2d 1310, 1313 (8th Cir., 1987) ("The debtor's discretion to place similar claims in different classes is not unlimited, however. Classifications designed to manipulate class voting must be carefully scrutinized. There is potential for abuse when the debtor has the power to classify creditors in a manner to assure that at least one class of impaired creditors will vote for the plan, thereby making it eligible for the cram down provisions."); <u>Teamsters National Freight Industry Negotiating Comm. v. U.S. Truck Co.</u>, 800 F.2d 581, 586 (6th Cir., 1986) ("Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.").

88) Even in circuits where a proponent is allowed to separate similar claims according to the facts and circumstances of the case, this discretion is not unlimited.

> There must be some limit on a debtor's power
> to classify creditors…  The potential for
> abuse would be significant otherwise.  If
> the plan unfairly creates too many or too
> few classes, if the classifications are
> designed to manipulate class voting, or if
> the classification scheme violates basic
> priority rights, the plan cannot be
> confirmed.  <u>In re Tucson Self-Storage, Inc.</u>,
> 166 B.R. 892 (9th Cir. B.A.P., 1994).

89) As the Fifth Circuit in <u>In re Greystone</u>, 995 F.2d 1274, 1279 (5th Cir., 1992) announced: "there is one clear rule that emerges from otherwise muddled caselaw on §1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."

90) The approval of the Joint Plan in tantamount to the approval of a plan that:

> aims to disenfranchise the overwhelmingly largest creditor through artificial classification is simply inconsistent with the principles underlying the Bankruptcy Code. A key premise of the Code is that creditors holding greater debt should have a comparably greater voice in reorganization. (…) Chapter 11 is far better served by allowing those creditors with the largest unsecured claims to have a significant degree of input and participation in the reorganization process, since they stand to gain or lose the most from the reorganization of the debtor. <u>Boston Post</u>, <i>supra</i>, at 483.

91) The Joint Plan unfairly discriminates in the classification of the general unsecured claims by dividing them into two classes when there is no legal reason to do so.

**D. <u>Third-Party Releases</u>**

92) The approval of the Joint Plan would grant an improper release to third parties.

93) Section 8.1 of the Joint Plan states: "Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or the Plan, the distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, and release of Debtor **and its guarantors** of any debt that arose before the Effective Date…." (Joint Plan, pages 36-37). (Our emphasis).

94) The guarantors to the debts with BPPR are Rodríguez, Mrs. Iwalani Lum-King, Potrero Matos, Inc., T-MG, Inc., Mr. Joaquín López Cámara and his wife Mrs. María Elena Matos (hereinafter collectively, the "Guarantors").

95) The Bankruptcy Code provides that a discharge of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt. 11 U.S.C. §524(e).

96) BPPR objects to the release of the guarantors in this case through the approval of the Joint Plan.

97) There is a split among circuits regarding the propriety of third-party releases in a plan of reorganization.

98) The Fifth, Ninth and Tenth Circuits have ruled that they are prohibited to grant a release to nondebtors by the Bankruptcy Code: (<u>Feld v. Zale</u>, 62 F.3d 746, 761, 5th Cir., 1995; "Accordingly, because the permanent injunction as entered improperly discharges a potential debt of CIGNA, a nondebtor, the bankruptcy court exceeds its powers under §105".), (<u>Resorts International v. Lowenschuss</u>, 67 F.3d 1394, 9th Cir., 1995; "this court has repeatedly held, without exception, that §524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."), Circuits (<u>Landsing Diversified Props v. First National Bank</u>, 922 F.2d 592, 10th Cir., 1990; "Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any countervailing justification of debtor protection -- as discussed earlier, the discharge injunction provided for in section 524(a) already frees the debtor from potential derivative claims, such as indemnification or subrogation, that might arise from the creditor's post-confirmation attempts to recover the discharged debts from others.")

99) The Second , Fourth, Sixth, and Seventh Circuits have ruled that they may be allowed under special circumstances ("Because such an injunction is a dramatic measure to be used

cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.") (<u>Class Five Nev. Claimants v. Dow Corning Corp.</u>, 280 F.3d 648, 658 (6th Cir., 2002); <u>In Re Specialty Equip. Cos., Inc.</u>, 3 F.3d 1043 (7th Cir. 1993); <u>Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc.</u> *(In re Drexel Burnham Lambert Group, Inc.),* 960 F.2d 285, 293 (2nd Cir. 1992); <u>Menard-Sanford v. Mabey (In re A.H. Robins Co.)</u>, 880 F.2d 694, 702 (4th Cir. 1989).

100) The First Circuit has identified but has not ruled on this issue. See <u>Monarch Life Insurance Co. v. Ropes & Gray</u>, 65 F.3d 973, 983-84 (1st Cir., 1995).

101) The issue of an injunction covering a nondebtor issued under §105(a) had been addressed by the First Circuit in <u>In re G.S.F. Corp.</u>, 938 F.2d 1467 (1st Cir., 1991). The court in <u>G.S.F.</u> ruled that the exercise of the court's equitable power to stay a third party action not involving the debtor was an extraordinary exercise of discretion, and there must be some effect on the debtor's estate stemming from the action before there is bankruptcy court jurisdiction to enjoin it. *Id* at 1474.

102) Courts, including some in the First Circuit, have looked to the so-called "Master Mortgage factors" to determine whether unusual circumstances exist to grant a third-party release or injunction. These are:

> (1) An identity of interests between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;
>
> (2) The non-debtor has contributed substantial assets to the reorganization;
>
> (3) The injunction is essential to the reorganization ….;
>
> (4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has 'overwhelmingly' voted to accept the proposed plan treatment;
>
> (5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.
>
> *In re Master Mtg. Inv. Fund, Inc.,* 168 B.R. 930, 935 (Bankr. W.D. Miss. 1994), as cited in Mahoney Hawkes, *supra*, at 297-98.

103) These factors are not present in the present case and, as such, do not merit the release of third-party guarantors.

a) A suit against the Guarantors is not a suit against the Debtor or would deplete assets of the estate. The Debtor is a separate corporate entity from the Guarantors.

b) The Guarantors have not contributed substantial assets to the reorganization. Although Rodríguez has proposed a capital contribution to the reorganization, BPPR reiterates its objections as discussed above and propose that these problems render the contribution invalid to qualify for this exception.

c) The injunction is not necessary to the reorganization.

d) BPPR represents in by far the largest creditor and is the impacted class by this release.

e) The plan does not provide for the payment of all, or substantially all of BPPR's claims which are affected by the release.

104) The third-party releases are improper under the Bankruptcy Code and the caselaw and render the plan unconfirmable.

## IV. Conclusion

105) The Disclosure Statement is missing crucial information and therefore does not comply with the adequate information standard of §1125 and should not be approved.

106) No adequate information was provided regarding the superpriority financing, the Effective Date, the valuation of the property and of the equity component of the financing.

107) The Disclosure Statement should further be denied since the Joint Plan is unconfirmable on its face.

108) The Joint Plan is not fair and equitable regarding the treatment of classes 2 and 3, violates the absolute priority rule, provides no adequate protection to BPPR, discriminates unfairly in the classification of claims, and provides improper releases to third parties.

109) For the aforesaid reasons, the approval of the Disclosure Statement should be DENIED.

**WHEREFORE** it is very respectfully requested from this Honorable Court to DENY the approval of the Disclosure Statement.

**RESPECTFULLY SUBMITTED** in San Juan, Puerto Rico, this 24th day of June, 2010.

**I HEREBY CERTIFY** that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to **ALEXIS FUENTES HERNANDEZ** alex@fuentes-law.com, **IRVING K HERNANDEZ VALLS HERNANDEZ** irving@ikhlaw.com, **CARLOS RODRIGUEZ QUESADA** cerqlaw@coqui.net, **JESUS R RABELL MENDEZ** jrabellcsp@prtc.net, **JAVIER LOPEZ-PEREZ** javiersnoopy@hotmail.com, **CARMEN PRISCILLA FIGUEROA- BELL** cfigueroa@crimpr.net, **JORGE L**

GERENA MENDEZ jlgere@gmail.com, WILLIAM SANTIAGO SASTRE wsantiago@mpdjlaw.com, MONSITA LECAROZ ARRIBAS ustpregion21.hr.ecf@usdoj.gov, RAFAEL BAELLA SILVA rbaellasilva@baellalaw.com, JORGE R COLLAZO SANCHEZ coa@prtc.net, ISABEL M RODRIGUEZ CASELLA imr@sbsmnr.com, Municipality of Guayama alfredo@castlawfirm.com, PATRICIA GUIJARRO ALFONSO p-guijarro-dsac@prepa.com, ANTONIO A ARIAS LARCADA aaa@mcvpr.com, FREDERIC CHARDON DUBOS fcdlaw@gmail.com, YARILYN C PEREZ COLON ycp@mcvpr.com, MARTITA ROLON APONTE, CPA martitaroloncpa@yahoo.com, ALEJANDRO A SUAREZ CABRERA Alejandro.Suarez@cfse.gov.pr, TREASURY DEPARTMENT OF PUERTO RICO bankruptcyjusticia.gobierno.pr@gmail.com, NAYELI DIAZ FEBLES bankruptcyjusticia.gobierno.pr@gmail.com, MIGDA L RODRIGUEZ COLLAZO bankruptcyjusticia.gobierno.pr@gmail.com, MARALIZ VAZQUEZ MARRERO maralizvaz@gmail.com, JOSE A SANCHEZ GIRONA jsg@saldanalaw.com,LUISE.FUSTE-LACOURT igartuafustelaw@gmail.com ,USTRUSTEEustpregion21.hr.ecf@usdoj.gov, UBALDO M FERNANDEZ ubaldo.fernandez@oneillborges.com, ALFREDO F. RAMIREZ MACDONALD alfredo.ramirez@oneillborges.com, and that the undersigned has sent copy by certified mail return receipt requested to ALEXIS FUENTES HERNANDEZ P.O Box 9022726, San Juan, P.R. 00902-2726, ANTONIO A ARIAS LARCADA McConnell Valdes, PO Box 364225, San Juan, PR 00936-4225, MONSITA LECAROZ ARRIBAS OFFICE OF THE US TRUSTEE (UST) OCHOA BUILDING500 TANCA STREET SUITE 301 SAN JUAN,

PR 00901, **WIGBERTO LUGO MENDER** Centro Internacional de Mercadeo Carr 165 Torre I Suite 501 Guaynabo, PR 00968, **EL LEGADO DE CHI CHI RODRIGUEZ GOLF RESORT SC SE** PO BOX 2880 GUAYAMA, PR 00785, **Committee of Unsecured Creditors** THE HATO REY CENTER SUITE 440 268 PoPONCE DE LEON AVE SAN JUAN, PR 00918, **CHI CHI RODRIGUEZ & IWALANI RODRIGUEZ** PO BOX 2880 GUAYAMA, PR 00785 and by regular mail to all creditor's included in the attached mailing matrix.

S/JESUS RABELL MENDEZ
U.S.D.C. #126701
RABELL-MÉNDEZ C.S.P.
P.O. BOX 195580
SAN JUAN, PR 00919-5580
TEL. (787) 764-1212
FAX. (787)754-6872

Label Matrix for local noticing
0104-2
Case 08-08321-BKT11
District of Puerto Rico
Ponce
Wed Jun 23 14:10:57 AST 2010

Asoc de Condomines El Legado Golf Resort Reg
PO Box 3500
Guayama, PR 00784

BLASUS PROFESSIONAL AND COMMUNICATIONS SERVI
PO BOX 2130
GUAYAMA, PR 00785-2130

CRIM
PO BOX 195387
SAN JUAN, PR 00919-5387

Committee of Unsecured Creditors
THE HATO REY CENTER SUITE 440
268 PoPONCE DE LEON AVE
SAN JUAN, PR 00918

EL LEGADO DE CHI CHI RODRIGUEZ GOLF RESORT S
PO BOX 2880
GUAYAMA, PR 00785-2880

Municipality of Guayama
Apartado 360
Guayama, PR 00785-0360

POTRERO MATOS INC
GRANADA STREET 2406
SAN JUAN, PR 00913-4702

PREPA
PATRICIA GUIJARRO ALFONSO ESQ
PO BOX 363928
SAN JUAN, PR 00936-3928

STATE INSURANCE FUND CORP
ALEJANDRO A SUAREZ CABRERA ESQ
PO BOX 365028
SAN JUAN, PR 00936-5028

T-MG INC
Granada Street 2406
San Juan, PR 00913-4702

TREASURY DEPARTMENT OF PUERTO RICO
FEDERAL LITIGATION DIVISION
DEPARTMENT OF JUSTICE
PO BOX 9020192
SAN JUAN, PR 00902-0192

UNITED SURETY & INDEMNITY COMPANY
Saldana & Saldana-Egozcue, PSC
208 Ponce De Leon Ave
Suite 1420
San Juan, PR 00918-1019

US TRUSTEE
EDIFICIO OCHOA
500 TANCA STREET SUITE 301
SAN JUAN, PR 00901-1938

WESTERNBANK PUERTO RICO
268 MUNOZ RIVERA AVE
WESTERNBANK WORLD PLAZA STE 600
SAN JUAN, PR 00918

US Bankruptcy Court District of PR
Southwestern Divisional Office
US Courthouse and Post Office Building
93 Atocha Street, Second Floor
Ponce, PR 00730-3759

AEE
PO BOX 363508
SAN JUAN  PR 00936-3508

AGRO SERVICIOS INC
PEDRO J VIVONI
PO BOX 360393
SAN JUAN PR 00936-0393

AGROSERVICIOS PR
PO  BOX 360393
SAN JUAN  PR 00936

ALLIED BFI
WASTE MANAGEMENT
AVE  BARAMAYA FINAL
PONCE  PR 00731

ASOCIACION DE CONDOMINIOS
EL LEGADO GOLF RESORT
AVENIDA ESPADACHIN
GUAYAMA PR 00784

AXESA
P.O. BOX 70373
SAN JUAN, PR  00936-8373

AXESA SERVICIOS DE INFORMACION
PO BOX 70373
SAN JUAN PR 00936-8373

Agro Services, Inc.
P.O. Box  360393
San Juan, PR  00936-0393

Alejandro Suarez Cabrera, Esq.
Attorney For State Insurance Fund Corp
P.O. Box 365028
San Juan, PR  00936-5028

Alfredo F. Ramirez McDonald, Esq.
American Internation Plaza
250 Munoz Rivera Ave  Suite 800
San Juan, PR  00918-1813

Allied-BFI
Waste Management
3060 Ponce Byapass
Ponce, PR  00728-1511

Ariel Acosta Colon, Engineer
P.O. Box 1599
Guaynabo, PR 00970-1599

BEST GOLF CARTS
PO BOX 9408
CAGUAS PR 00726-9408

BFI
Palmas Ward, Calle A Lote 5
Catano, PR  00962

BLASUS COMMUNICATIONS
ASHFORD 107 SUR
GUAYAMA PR 00784

BRENTI CONSTRUCTION INC
PO BOX 360355
SAN JUAN PR 00936-0355

Blasus Professional & Communications
Service
P.O. Box 2130
Guayama, PR 00785-2130

CHICHI RODRGUEZ & IWALANI RODRIGUEZ
EL LEGADO GOLF RESORT
PO BOX 2880
GUAYAMA PR 00785

CITICAPITAL GOLF CARTS
PO BOX 71443
SAN JUAN PR 00936-8543

COCA-COLA
MEDALLA
PO BOX 51985
TOA BAJA PR 00950-1985

CRIM
CARMEN P FIGUEROA ESQ
PO BOX 195387
SAN JUAN PR 00919-5387

CRUZ CONSULTING GROUP
PO BOX 749
CAGUAS PR 00726-0749

CRUZ CONSULTING GROUP & JOSE L CRUZ CRUZ
PO BOX 749
CAGUAS PR 00726-0749

Carmen Priscilla Figueroa Bell, Esq.
P.O. Box 195387
San Juan, PR 00919-5387

Cruz Consulting Group
796 Km 2.6 Rio Canas 26
Caguas, PR 00725

DEPARTMENT OF JUSTICE
Federal Litigation Unit
P.O. Box 9020192
San Juan, PR 00902-0192

DEPT OF THE TREASURY
10 COVANDONGA
SAN JUAN PR 00901

Department Of Treasury
Bankruptcy Section(424-B)
P.O. Box 9024140
San Juan, PR 00902-4140

EASTERN PACIFIC APPAREL, INC
ATTN CREDIT MANAGER
PO BOX 72
BRATTLEBORO, VT 05302-0072

EMPRESAS PITUSA
CALL BOX 839
HATO REY PR 00919-0839

EP PLAYER
8 WEST 40TH STREET
NEW YORK NY 10018

EP PLAYER
8 WEST 40TH STREET
NEW YORK, NY 10018-3902

El Legado De Chi Chi Rodriguez Golf
Resort SC SE
P.O. Box 2880
Guayama, PR 00785-2880

El Legado Homeowners Association
Legado Golf Resort
Box 2500
Guayama, PR 00785

FONDO DEL SEGURO DEL ESTADO
SAN JUAN PR 00901

Foot Joy
Titleist
P.O. Box 965
Fairhaven, MA 02719-0965

Frederic Chardon Dubos, Esq.
HC-3 Box 9551
Moca, PR 00676-9043

GE Capital Commercial Services
P.O. Box 6229
Carol Stream, IL 60197-6229

GOLF EL LEGADO RESORT
PO BOX 2880
GUAYAMA PR 00785

IVU GOLF COURSE
DEPARTAMENTO DE HACIENDA
10 COVADONGA
SAN JUAN PR 00901

Internal Revenue Service
City View Plaza II
48 Carr 165 Suite #2000
Guaynabo, PR 00968-8000

Isabel M. Rodriguez Casella, Esq.
Sanchez, Betances,Sifre & Munoz Noya
P.O. Box 364428
San Juan, PR 00936-4428

JOSE SANTIAGO INC
PO BOX 191795
SAN JUAN PR 00959

Javier Lopez Perez, Esq.
The Hato Rey Center Suite 440
268 Ponce Leon Ave
San Juan, PR 00918-2002

Jesus Rabell Mendez, Esq.
P.O. Box 195580
San Juan, PR  00919-5580

Joaquin Lopez Camara
Granada Street 2406
San Juan, PR 00913-4702

Jorge L. Gerena-Mendez, Esq.
P.O. Box 195542
San Juan, PR  00919-5542

Jorge R. Collazo-Hernandez, Esq.
P.O. Box 1494
Coamo, PR 00769-1494

Jose A. Sanchez Girona, Esq.
Popular Center Suite 1420
208 Ponce De Leon Avenue
San Juan, PR 00918-1000

Jose Santiago, Inc.
P.O. Box 191795
San Juan, PR 00919-1795

Juan A. Rodriguez Vila
P.O. Box 2880
Guayama, PR 00785-2880

KILPATRICK
MAINTENANCE EQUIPMENT
7700 HIGH RIDGE ROAD
BOYTON BEACH FL 33426

KILPATRICK
REPLACEMENT PARTS ACCOUNT
7700 HIGH RIDGE ROAD
BOYTON BEACH FL 33426

Kilpatrick
7700 High Ridge Road
Boynton Beach, FL 33426-9326

LIGHT GAS CORPORATION
BOX 1155
SALINAS PR 00751

Light Gas Corporation
Box 1155
Salinas, PR 00751-1155

Luis E. Fuste-Lacourt,Esq.
Banco Popular Center-Suite 1420
208 Ponce De Leon Ave.
San Juan, PR 00918-1000

MARGO GARDEN PRODUCTS
CALL BOX 1370
DORADO PR 00646

MARQTEK CORPORATION
MARQTEK
PO BOX 1500
GUAYAMA PR 00785-1500

MARQTEK CORPORATION
P.O. BOX 1500
GUAYAMA, PR 00785-1500

MENDEZ & CO
PO BOX 363348
SAN JUAN PR 00936-3348

MUNICPIO DE GUAYAMA
OFICINA DE RECAUDACIONES
GUAYAMA PR 00784

Margo Gardens Products
P.O. Box 1370
Dorado, PR 00646-1370

Miguel Bonin
P.O. Box 34417
Ponce, PR  00734-4417

Mueblerias Pitusa
Carretera #3  Calle McArthur
Antiguo Local Unibis
Guayama, PR  00784

Municipality Of Guayama
Patentes Municipales
P.O. Box 360
Guayama, PR  00785-0360

P.R. Power Electric Authority
Bankruptcy Division
P.O. Box 364267
San Juan, PR  00936-4267

PITUSA GUAYAMA
FURNITURE FOR VILLA
GUAYAMA PR 00784

POTRERO MATOS INC
2406 CALLE GRANADA
PUNTA LAS MARIAS
SAN JUAN PR 00913

PRIMA DIRECT
14694
SAN LEANDRO CA 94577

PUERTO RICO HIGHWAY & TRANSP AUTHORITY
ATNN FREDERICK AULD ESQ
PO BOX 42007
SAN JUAN PR 00940-2007

Potrero Matos, Inc.
Granada Street 2406, Punta Las Marias
San Juan, PR  00913

Prima Direct
14694 San Leandro
California, CA  94577

Puerto Rico Department of Labor
Bureau of Legal Affairs - 18th Floor
PO Box 71592
San Juan, PR 00936-8692

ROOMAR AGENCIES
CASA DE JARDINERO
RR 10 BOX 5250
SAN JUAN PR 00926-9678

ROOMAR AGENCIES
CASA DEL JARDINERO
RR-10 BOX 5250
SAN JUAN, PR 00926-9524

SALINA HOLDINGS
CALL BOX 1370
DORADO PR 00646

SALINAS HOLDINGS
CALL BOX 1370
DORADO, PR 00646-1370

SEPTIX WASTE SERVICE
P.O. BOX 490
MERCEDITA, PR 00715-0490

SUPERIOR ANGRAN
PO BOX 361985
SAN JUAN PR 00936

State Insurance Fund Corporation
Bankruptcy Division
P.O. Box 365028
San Juan, PR 00936-5028

Superior Angran, Inc.
P.O. Box 361985
San Juan, PR 00936-1985

T-MG INC.
GRANADA STREET 2406, Punta Las Marias
SAN JUAN, PR 00913

TMG CORP
2406 CALLE GRANADA
PUNTA LAS MARIAS
SAN JUAN PR 00913

TOWN TALK PRO SHOP
PO BOX 58157
LOUISVILLE KY 40268-0157

TREASURY DEPARTMENT COMMONWEALTH PUERTO RICO
PO BOX 9024140
SAN JUAN, PR 00902-4140

Titleist And Foot Joy
878 Old Plainville Rd
New Bedford, MA 02745-4938

Treasury Department Of Puerto Rico
Federal Litigation Unit-Dept. Of Justice
P.O. Box 9020192
San Juan, PR 00902-0192

Ubaldo M. Fernandez Barrera, Esq.
American International Plaza
250 Munoz Rivera Ave. Suite 800
San Juan, PR 00918-1813

United Surety & Indemnity Co.
on behalf of Valencia Destape & Plumbing
Saldana & Saldana-Egozcue, PSC
208 Ponce De Leon Ave., Suite 1420
San Juan, PR 00918-1019

United Surety & Indemnity Company
Saldana & Saldana-Egozcue, PSC
208 Ponce De Leon Ave. Suite 1420
San Juan, PR 00918-1019

WESTERNBANK PUERTO RICO
PO BOX 1450
MAYAGUEZ PR 00681-1450

WITTEK
3865 COMMERCIAL AVE
NORTHBROOK IL 60062

Westernbank Puerto Rico
Westernbank World Plaza Suite 600
268 Munoz Rivera Ave
San Juan, PR 00918-1913

Wittek
3865 Commercial Avenue
Northbrook, IL 60062-1826

JORGE L GERENA MENDEZ
GERENA LAW OFFICE
PO BOX 195542
SAN JUAN, PR 00919-5542

JORGE LUIS GERENA MENDEZ
PO BOX 195542
SAN JUAN, PR 00919-5542

MARTITA ROLON APONTE, CPA
PO BOX 2027
AIBONITO, PR 00705-2027

MONSITA LECAROZ ARRIBAS
OFFICE OF THE US TRUSTEE (UST)
OCHOA BUILDING
500 TANCA STREET SUITE 301
SAN JUAN, PR 00901-1938

ROBERTO BOLORIN SANTIAGO
PO BOX 2406
GUAYAMA, PR 00785-2406

WIGBERTO LUGO MENDER,
Centro Internacional de Mercadeo
Carr 165 Torre I Suite 501
Guaynabo, PR 00968

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)BANCO POPULAR DE PUERTO RICO

(d)Blasus Communications
Ashford 107 Sur
Guayama, PR  00784

(d)Brenti Construction, Inc.
P.O. Box 360355
San Juan, PR  00936-0355

(d)CRIM
PO BOX 195387
SAN JUAN PR 00919-5387

(d)Mendez & Co.
P.O. Box 363348
San Juan, PR  00936-3348

(d)SEPTIX WASTE SERVICE
PO BOX 490
MERCEDITA PR 00715-0490

(d)TOWN TALK-PRO SHOP
P.O. BOX 58157
LOUISVILLE, KY  40268-0157

(u)JUAN A RODRIGUEZ VILA

(d)JUAN A RODRIGUEZ VILA
PO BOX 2880
GUAYAMA, PR 00785-2880

(d)JUAN A RODRIGUEZ VILA
PO BOX 2880
GUAYAMA, PR 00785-2880

(d)Joaquin Lopez Camara
Granada Street 2406
San Juan, PR 00913-4702

End of Label Matrix
Mailable recipients    116
Bypassed recipients     11
Total                  127